**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Blair E. Reed (State Bar No. 316791)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
          jsmith@bursor.com
          breed@bursor.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILL KAUPELIS and FRANK ORTEGA, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>       v.<br><br>HARBOR FREIGHT TOOLS USA, INC.,<br><br>                              Defendant. | Case No.   8:19-cv-1203<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs Will Kaupelis and Frank Ortega ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Harbor Freight Tools USA, Inc. ("Harbor Freight" or "Defendant") for the manufacture, marketing, and sale of Portland, One Stop Gardens, and Chicago Electric 14-inch Electric Chainsaw products identified below.  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF ACTION

1.      This is a class action against Defendant Harbor Freight Tools USA, Inc. for the manufacture and sale of Portland, One Stop Gardens, and Chicago Electric 14-inch Electric Chainsaws (collectively, the "Products"), all of which suffered from an identical defect in design.  Specifically, the power switch was prone to malfunction, causing the chainsaw blade to continue operating after the operator moves the power switch to the "off" position.  A chainsaw that takes on a life of its own by not turning off when necessary is extraordinarily dangerous.  This defect rendered the Products unsuitable for their principal and intended purpose.

2.      Plaintiffs bring their claims against Defendant individually and on behalf of a class of all other similarly situated purchasers of the Products for (1) violation of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17210; (3) fraud; (4) unjust enrichment; (5) breach of implied warranty; and (6) violations of the Magnuson-Moss Warranty Act.

## PARTIES

3.      Plaintiff Will Kaupelis is, and at all times relevant to this action has been, a resident of Placentia, California.  In approximately the fall of 2016, Mr. Kaupelis purchased a Portland brand 14-inch Electronic Chainsaw from a Harbor Freight store located in San Bernardino, California.  Mr. Kaupelis purchased the

Product because he believed it was fit for use as a chainsaw. However, the Product Mr. Kaupelis purchased was not fit for use as a chainsaw due to the Product's malfunctioning power switch. Mr. Kaupelis would not have purchased the Product had he known that the Product was unfit to perform its intended purpose, rendering the Product useless.

4.     The power switch on the Product that Mr. Kaupelis purchased malfunctioned shortly after he purchased it. Mr. Kaupelis threw the Product in the trash because he was afraid to use it. Mr. Kaupelis disposed of the Product long before he ever contemplated litigation.

5.     Mr. Kaupelis reviewed the Product's packaging prior to purchase. Defendant disclosed on the packaging that the Products were chainsaws and described features typical of chainsaws but did not disclose the defect. Had there been a disclosure, Mr. Kaupelis would not have bought the Product because the defect would have been material to him, or at the very least, he would have purchased the product at a substantially reduced price. Mr. Kaupelis relied on the packaging in making his purchase decision.

6.     Plaintiff Frank Ortega is, and at all times relevant to this action has been, a resident of Reseda, California. In approximately the spring of 2017, Mr. Ortega purchased a Portland brand 14-inch Electronic Chainsaw from a Harbor Freight store located in Northridge, California. Mr. Ortega purchased the Product because he believed it was fit for use as a chainsaw. However, the Product Mr. Ortega purchased was not fit for use as a chainsaw due to the Product's malfunctioning power switch. Mr. Ortega would not have purchased the Product had he known that the Product was unfit to perform its intended purpose, rendering the Product useless.

7.     Mr. Ortega reviewed the Product's packaging prior to purchase. Defendant disclosed on the packaging that the Products were chainsaws and described features typical of chainsaws but did not disclose the defect. Had there

been a disclosure, Mr. Ortega would not have bought the Product because the safety defect would have been material to him, or at the very least, he would have purchased the product at a substantially reduced price.  Mr. Ortega relied on the packaging in making his purchase decision.

8.     Defendant Harbor Freight Tools USA. Inc. is a Delaware corporation with its principal place of business at 26541 Agoura Rd., Calabasas, California. Defendant manufactures, markets, and distributes the Products throughout the United States.  Defendant sells its products directly to consumers in Harbor Freight stores and on Harbor Freight's website.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

10.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District, a substantial part of the events giving rise to Plaintiffs' claims took place within this District because Plaintiffs purchased their Products in this District and reside in this District.

## COMMON FACTUAL ALLEGATIONS

### I.     The Power Switch Defect

12.     Defendant Harbor Freight is a hardware store franchise that owns and operates over 900 hardware stores nationwide.  Among the various tools sold by Defendant are Portland, One Stop Gardens, and Chicago Electric 14-inch Electric Chainsaws, which are the products at issue here ("the Products").  Except for the brand names, the Products are identical and share the same model number 62755.

13.     The Products were made with defective power switches, causing the chainsaw blade to continue operating after the operator moves the power switch to the "off" position (hereinafter, the "Product Defect" or "power switch defect").  The Product Defect was substantially likely to materialize during the useful life of the Product.

14.     With over a million units sold at approximately $50 each, Harbor Freight profited enormously from its failure to disclose the Product Defect sooner.

15.     The power switch defect at issue here involves a critical safety-related component of the Products, and it was unsafe to operate the Products with the defective power switch.  Defendant had exclusive knowledge of the defect, which was not known to Plaintiff or class members.

16.     Defendant made partial representations to Plaintiffs and class members, while suppressing the safety defect.  Specifically, by displaying the Products and describing their features, the product packaging implied that the Products were suitable for use as a chainsaw, without disclosing that they had a critical safety-related defect that could result in harm to users of the Products.  In fact, the product packaging specifically called-out the "Safety Lock-Out Switch," conveying the impression that the product was specially designed to <u>prevent</u> it from unintended or undesired operation.

## II.     Defendant's Sham Recall

17.     In May of 2018, Harbor Freight issued a recall of the Products.

18.     The recall was due to a serious injury hazard associated with the Products.  Specifically, Harbor Freight admitted that its Products had a defect in design and materials that caused the chainsaw to continue operating after the operator moves the power switch to the "off" position.

19.     Harbor Freight sold over 1,000,000 Products in the United States.

20.     As of August 31, 2018, barely 2% of the Products were returned as part of the recall, and Harbor Freight generally declined refund requests.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                         4

21.     The recall allowed Harbor Freight to *say* it was doing right by its customers, but in fact the recall protected Harbor Freight's profits by suppressing returns:

(a)     The recall notice was only briefly publicized.

(b)     Defendant's website contained a link to recall information, but the link was in small, inconspicuous text buried among a lengthy list of other links, and class members would not have a reason to follow the link if they did not already know about the recall in the first place.

(c)     Defendant only mailed notices to approximately 2% of purchasers.

(d)     Defendant did not email people who purchased Products online, despite the fact that email notice is a relatively low-cost and effective means of contacting consumers.

(e)     Harbor Freight only offered replacement units in connection with the recall.  Harbor Freight did not offer cash refunds in lieu of a replacement, and customers' requests for cash refunds were generally denied.

(f)     People who were willing to take a replacement unit had to pick up the replacement in-person at a Harbor Freight store, though in this day and age, replacements via mail are the norm for companies who sell products online.  Even some consumers who complied with recall instructions came away empty-handed. Consumers reported difficulty attaining replacement units.  For instance, one consumer wrote, "I went to the store with the notice I received telling me to stop using the chainsaws I purchased … and the store refused to exchange the product."

//

//

//

//

//

### III.   Harbor Freight's Pre-Sale Knowledge Of The Defect

#### A.   Harbor Freight Received Complaints Directly From Customers And Through The CPSC

22.   Years before issuing the recall, Harbor Freight received reports of chainsaws continuing to operate after being turned off by the operator.

23.   The United States Consumer Products Safety Commission ("CPSC") operates a website where consumers can post complaints about unsafe products and provide details about any incidents they experienced.

24.   Online safety reports to the CPSC show that Harbor Freight knew or should have known of the defect since at least 2014, yet it continued to sell the defective products anyway.

25.   Per federal regulations, all safety reports that are submitted online through the CPSC website are sent directly to the product's manufacturer.  As set forth in more detail below, the CPSC website indicates that all safety complaints referenced herein were sent to Defendant, including the dates on which they were sent.  Defendant also monitors safety complaints from the CPSC, and thus Defendant would have independently become aware of each safety report referenced herein separate and apart from noticed received from the CPSC.

26.   On February 7, 2014, a consumer submitted a report to the CPSC concerning Harbor Freight's 14 in. electric chainsaw, which the consumer identified as Model No. 67255.  The complaint stated: "Was using a Chicago 14" electric can saw – model 67255 – purchased from Harbor Freight in Green Bay, Wisconsin in February of 2013 . . . When I released the safety switch and trigger switch to shut the saw off it failed to shutdown."  The consumer further stated that it was "nearly impossible to remove the heavy glove from my left hand to disconnect the saw while holding the running saw safely in my right hand.  I contacted Tech support at Harbor Freight and was told to have the saw repaired and that they no longer carried replacement switches …"  The consumer stated that he independently contacted and

alerted Harbor Freight about this defect.  The CPSC also sent this complaint to Harbor Freight on March 10, 2014.  Hence, Harbor Freight was alerted twice about this incident—once by the consumer directly and then again later by the CPSC.

27.     On April 8, 2014, a consumer submitted a report to the CPSC concerning Harbor Freight's 14 in. electric chainsaw, which the consumer identified as Item No. 67255.  The complaint stated:  "The consumer stated that when he turned on the saw, it initially worked normally. … The consumer stated that the chain saw would not turn off.  The consumer stated that releasing the lock out switch did not turn off the chain saw either.  The consumer stated that when he was able to get down safely from the ladder, he pulled the chain saw cord out from the extension cord.  That allowed the chain saw to turn off. … The consumer stated that he has been put on hold with the manf and has gotten no where."  The CPSC sent this complaint to Harbor Freight on April 29, 2014.  Hence, Harbor Freight was alerted twice about this incident—once by the consumer directly and then again later by the CPSC.

28.     On May 5, 2014, a consumer submitted a report to the CPSC concerning Harbor Freight's 14 in. electric chainsaw, which the consumer identified as Model No. 67255.  The consumer stated: "The trigger switch to turn it on gets stuck in the on position ... I can't get it to turn off ... Obviously I can't use it anymore.[]  It's going to get someone seriously injured or killed if action is not taken."  The consumer independently contacted and alerted Harbor Freight about this defect.  The CPSC sent this complaint to Harbor Freight on May 13, 2014.  Hence, Harbor Freight was alerted twice about this incident—once by the consumer directly and then again later by the CPSC.

29.     On June 22, 2015, a consumer submitted a report to the CPSC concerning Harbor Freight's 14 in. electric chainsaw, which the consumer identified as Model No. 67255.  The consumer stated: "Cutting wood.  When wood was cut I released both the trigger switch (should have turned off immediately) AND the

interlock switch.  The chainsaw stayed ON and knocked wood scratching left shin.  So I disconnected it from the power source.  The chain saw is not turning off via the switch.  When it is plugged back in … it will start again … I'm assuming on off switch is defective.  Okay .. this is slightly really dangerous when a device requiring use of both hands does not turn off and requires user to disconnect from power source while holding device with one hand.  Chain saws are pretty dangerous."  The CPSC sent this complaint to Harbor Freight on June 30, 2015.

30.     On December 23, 2015, a consumer submitted a report to the CPSC concerning Harbor Freight's 14 in. electric chainsaw, which the consumer identified as Model No. 67255.  The complaint stated:  "My 14" electric chainsaw made by Chicago electric power tools sold by Harbor Freight Tools Model # 67255 suddenly would not shut off when the trigger switch was released.  This created a very dangerous situation in which I had stop the saw by stepping on the extension cord and pulling the saw loose at the electrical connection.  I took the saw apart and saw that the trigger switch, a small micro switch, wasn't releasing as it was supposed to.  I am in the process of calling the company to obtain a new switch which certainly hope works more reliably."  The consumer independently contacted and alerted Harbor Freight about this defect.  The CPSC sent this complaint to Harbor Freight on January 4, 2016.  Hence, Harbor Freight was alerted twice about this incident—once by the consumer directly and then again later by the CPSC.

31.     On March 7, 2016, a consumer submitted a report to the CPSC concerning Harbor Freight's 14 in. electric chainsaw, which the consumer identified as Model No. 67255.  The consumer stated that his or her chainsaw would not shut off despite the trigger being switched to the "off" position.  Specifically, the complaint stated:  "My chainsaw did the exact same thing as the above from report #[REDACTED] … LUCKY NOBODY WAS HURT."  The consumer independently contacted and alerted Harbor Freight about this defect.  The CPSC sent this complaint to Harbor Freight on March 15, 2016.  Hence, Harbor Freight

was alerted twice about this incident—once by the consumer directly and then again later by the CPSC.

32.    On May 1, 2017, a consumer submitted a report to the CPSC concerning Harbor Freight's 14 in. electric chainsaw, which the consumer identified as Model No. 67255.  The complaint stated:  "I WAS OPERATING AN ELECTRIC CHAIN SAW AND THE SAW CONTINUED TO RUN AFTER THE SAFETY SWITCH WAS RELEASED . I NEEDED TO PULL THE PLUG TO STOP THE TOOL."  The CPSC sent this complaint to Harbor Freight on May 9, 2017.

33.    On June 19, 2017, a consumer submitted a report to the CPSC concerning Harbor Freight's 14 in. electric chainsaw, which the consumer identified as Model No. 67255.  The complaint stated:  "I have a Chicago Electric brand electric chain saw item # 67255 purchased from Harbor Freight in Centereach NY a couple of years ago.  I used only a few times to trim a branch or two and cut some wood for my fire pit.  Just the other day while cutting some wood, the power trigger seemed to stick in the on position.  It took many times pressing and releasing to get the saw to stop.  I found this dangerous and disturbing should it be a manufacturer defect, effecting other units.  I tried a few times after to see what it would do and it intermittently continued to stick with the power on and blade operating."  The consumer independently contacted and alerted Harbor Freight about this defect.  The CPSC sent this complaint to Harbor Freight on June 27, 2017.  Hence, Harbor Freight was alerted twice about this incident—once by the consumer directly and then again later by the CPSC.

34.    On August 5, 2017, a consumer submitted a report to the CPSC concerning Harbor Freight's 14 in. electric chainsaw, which the consumer identified as Model No. 67255.  The complaint stated:  "I was cutting down some tree limbs using a Portland chainsaw (67255) purchased from Harbor Freight and it would not turn off upon releasing the trigger and safety switches.  I had to disconnect from the power source.  I was up a ladder and was lucky not injure myself."  The consumer

independently contacted and alerted Harbor Freight about this defect.  The CPSC sent this complaint to Harbor Freight on August 14, 2017.  Hence, Harbor Freight was alerted twice about this incident—once by the consumer directly and then again later by the CPSC.

35.   Every time the CPSC's website describes a consumer complaint, the website also discloses the date when CPSC sent that complaint to the manufacturer. This is separate from the portion of the safety complaint where the consumer states whether he or she independently contacted the manufacturer.  As alleged above, all of the above-referenced complaints were sent to Defendant by the CPSC shortly after being submitted to the CPSC.

36.   For each of the following reasons, Harbor Freight's management knew or should have known about the complaints referenced above as soon as they began appearing on the CPSC website in 2014, and in any event no later than November 2016:

(a)   First, as noted above, Harbor Freight was repeatedly contacted directly by consumers and by the CPSC about the same power switch problem.

(b)   Second, the CPSC website is a government-run repository for complaints about safety-related defects, and many of Harbor Freight's products appear in the website.  The CPSC website can provide businesses with early warnings of product defects, and monitoring reports is easy because users can search for reports by company names.  Hence, since at least 2011, it required negligible effort for Harbor Freight's management and other personnel to visit the CPSC website, type "Harbor Freight" in the search field, and view a list of reports of safety incidents related to Harbor Freight products, including reports about the Product Defect at issue here.

(c)   Third, Harbor Freight knows about the CPSC website because Harbor Freight states on its own website that information about its products is available on the CPSC website.

(d)     Fourth, on December 3, 2018, Harbor Freight publicly stated that had it "received customer complaints either through the CPSC or direct reports [from customers]" about the Product Defect.

**B.     Harbor Freight Received Complaints From Customers On Its Own Website And Then Deleted Those Complaints**

37.     In addition to receiving safety complaints from the CPSC, Defendant also knew or should have known about the defect through reviews posted on its own website.  In 2016, multiple consumers posted product reviews about the Product's defective trigger switch to Harbor Freight's own website, www.harborfreight.com.

38.     On March 18, 2016, a consumer posted a review on the Product's website page warning that the Chicago Electric 14 in. Electric Chainsaw's "[s]witch can be tricky."  Specifically, the consumer explained that "[e]ventually, the switch became harder and hard [sic] to keep turned on.  Then one day, it wouldn't turn off!":



41.     On March 28, 2016, another consumer posted a review that his or her Chicago Electric 14 in. Electric Chainsaw's "Switch wouldn't cut off."  The

consumer's review stated: "Danger.  Switch release and saw won't stop running.
Danger!"



42.    On September 3, 2016, another consumer posted a review concerning
the same power switch defect in his or her Chicago Electric 14 in. Electric Chainsaw.
The review stated:  "Used the saw for about 3 minutes.  The throttle switch was stuck
on.  Was not able to turn the saw off.  Had to unplug to turn off."



//
//
//
//
//
//
//
//

43.　On September 13, 2016, another consumer posted a review concerning the same power switch defect in his or her Chicago Electric 14 in. Electric Chainsaw. The review stated:  "First time I actually used it in Aug., the trigger switch would jam 'on' making it dangerous, as I had to unplug it to stop it."  The consumer also stated that he "called HF support" to try and get a replacement switch, but that there were "none available."



44.　There are two reasons why Harbor Freight would have seen the above-described warnings on its own website.  First, online reputation management (commonly called "ORM" for short), is now a standard business practice among most major companies and entails monitoring consumer forums, social media and other sources on the internet where consumers can review or comment on products. "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation."[1]  Many companies offer ORM consulting services for businesses.

---

[1] https://en.wikipedia.org/wiki/Reputationmanagement#Online_reputation_management

45. Like most companies, Harbor Freight presumably cares about its reputation and regularly monitors on-line customer reviews because they provide valuable data regarding quality control issue, customer satisfaction and marketing analytics. One-star reviews like those copied above would be particularly attention-grabbing for Harbor Freight's management because extreme reviews are sometimes the result of extreme problems, and—just like any other company—Harbor Freight presumably is sensitive to the reputational impact of negative on-line reviews. Hence, Harbor Freight's management knew or should have known about the above-referenced consumer complaints shortly after each complaint was posted on Harbor Freight's company website.

46. <u>Second</u>, at a bare minimum, Harbor Freight knew about the Product Defect by November 2016, when it removed all of the above-quoted reviews about the products from its website.[2] Harbor Freight removed the reviews even though consumers who are considering purchasing products often look at customer reviews prior to purchase. Harbor Freight sought to actively conceal information about the defect when it removed the adverse customer reviews describing the defect.

### C.   Other Indicia Of Harbor Freight's Pre-Sale Knowledge

47. Harbor Freight's management also knew or should have known about the defect because of the similarity of complaints to the CPSC and on Harbor Freight's website. The fact that so many customers made similar complaints about the same product indicates that the complaints were not the result of user error or an anomalous incident, but instead a systemic problem with the Product. Here, the reports and complaints from consumers—whether made directly to Harbor Freight employees, posted on Harbor Freight's website, or forwarded from the CPSC—were

---

[2] Screenshots from the above referenced consumer reviews were reviewed via the Internet Archive Wayback Machine, which captures images of websites as they appeared in the past.

similar enough to put Harbor Freight's management on notice that the incidents described were the result of a defect, and that the Products were experiencing unusually high levels of complaints about a defective power switch.

48.     Harbor Freight also knew about the Product Defect because it could not always meet the demand for replacement power switches.   Harbor Freight offers replacement parts for its products and maintains a customer service phone line and email dedicated to fielding requests for replacement parts.  Customers who experienced the defect complained in 2014, and again later in 2016, that Harbor Freight had no available replacement power switches, and had to turn down requests for replacement parts.  The frequent need for replacement parts, coupled with the fact that Harbor Freight was unable to meet the demand for replacement parts, put Harbor Freight on further notice of the Product Defect.

49.     Harbor Freight also would have had notice of the Product Defect as a result of product returns.  Before accepting a return from a customer, Harbor Freight's policy is to ask each customer for "a brief description of the reason(s) for the return," and to keep track of the reasons given.  Descriptions provided with returns of the Products therefore would have disclosed the defect.

50.     In short, by November 2016 at the latest, information from customer returns, complaints directly to Harbor Freight, negative reviews on Harbor Freight's website, information obtained from the CPSC, and the inability to meet the demand for replacement power switches, whether alone or in the aggregate, would have put Harbor Freight on notice of the defect.

## CLASS REPRESENTATION ALLEGATIONS

51.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Products (the "Class").  Excluded from the Class are persons who made such purchases for purpose of resale.

52.     Plaintiffs also seek to represent a subclass of all Class Members who purchased the Products in the State of California (the "California Subclass"). Excluded from the Class are persons who made such purchases for purpose of resale.

53.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

54.     At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclass ("Class Members" and "Subclass Members," respectively); however, given the nature of the claims and the number of retail stores in the United States selling Defendant's Products, Plaintiffs believe that Class and Subclass members are so numerous that joinder of all members is impracticable.

55.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(b)     whether Defendant's conduct was unfair and/or deceptive;

(c)     whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiffs and the Class;

(d)     whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages.

56.     With respect to the California Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendant violated the California Consumer Legal Remedies Act as well as California's False Advertising law.

57.     Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased, in a typical consumer setting, Defendant's Products, and Plaintiffs sustained damages from Defendant's wrongful conduct.

58.     Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses and have retained counsel that is experienced in litigating complex class actions.  Plaintiffs have no interests which conflict with those of the Class or the Subclass.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

60.     The prosecution of separate actions by members of the Class and the Subclasses would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class and the Subclasses even where certain Class or Subclass members are not parties to such actions.

## COUNT I

**Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.***

61.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

62.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

63.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality,

or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

64.     Defendant violated Civil Code § 1770(a)(5), (a)(7) and (a)(9) by holding out Products as fit for use as chainsaws, when in fact the products were defective, dangerous, and useless.

65.     The power switch defect at issue here involves a critical safety-related component of the Products, and it was unsafe to operate the Products with the defective power switch.

66.     Defendant had exclusive knowledge of the defect, which was not known to Plaintiffs or class members.

67.     Defendant made partial representations to Plaintiffs and class members, while suppressing the safety defect.  Specifically, by displaying the product and describing its features, the product packaging and Defendant's website implied that the product was suitable for use as a chainsaw, without disclosing that the Products had a critical safety-related defect that could result in harm to users of the Product. In fact, the product packaging specifically called-out the "Safety Lock-Out Switch," conveying the impression that the product was specially designed to <u>prevent</u> it from unintended or undesired operation.

68.     Plaintiffs and the members of the California Subclass have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid.

69.     On May 7, 2019, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code §1782(a).  The letter also provided notice of breach of express and implied warranties.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease

and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiffs and all other similarly situated purchasers.  Defendant responded to the letter on June 4, 2019.

70.     Plaintiffs and the Subclass members seek all relief available under the CLRA, including restitution, the payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court.

## COUNT II
### (Violation California's Unfair Competition Law)

71.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

72.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

73.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

74.     Defendant has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5) and (a)(7) as alleged above.

75.     Defendant's acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

76.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.

77.     Defendant's acts and practices described above also violate the UCL's proscription against engaging in unfair conduct.

78.     Plaintiffs and the other California Subclass members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products, or by virtue of paying an excessive premium price for the unlawfully, fraudulently, and unfairly marketed, advertised, packaged, and labeled product.

79.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the defective nature of the Products.

80.     Plaintiffs and the other California Subclass members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

81.     The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other members of the California Subclass.

82.     Pursuant to California Business and Professional Code § 17203, Plaintiffs and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to: (a) provide restitution to Plaintiffs and the other California Subclass members; (b) disgorge all revenues obtained as a result of violations of the UCL; (c) pay Plaintiffs' and the California Subclass' attorney's fees and costs.

## **COUNT III**

### **(Fraud by Omission)**

83.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

84.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

85.     This claim is based on fraudulent omissions concerning the safety of consumers who use the Products.  As discussed above, Defendant failed to disclose that the Products had a dangerous defect.

86.     The false and misleading omissions were made with knowledge of their falsehood.  Defendant is a nationwide hardware distributor who knew of reports of the Products' defective and dangerous nature.  Nonetheless, Defendant continued to sell its worthless chainsaws to unsuspecting consumers.

87.      The false and misleading omissions were made by Defendant, upon which Plaintiffs and members of the proposed Class and California Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiffs and members of the proposed Class and California Subclass to purchase the Products.

88.     The fraudulent actions of Defendant caused damage to Plaintiffs and members of the proposed Class and Subclass, who are entitled to damages and punitive damages.

## COUNT IV
### (Unjust Enrichment)

89.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

90.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant.

91.     Plaintiffs and Class members conferred benefits on Defendant by purchasing the Products.

92.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant

failed to disclose that the Products were unfit for use as chainsaws. These omissions caused injuries to Plaintiffs and Class members because they would not have purchased the Products if the true facts were known.

93.     Retention of those moneys also is unjust and inequitable because, as alleged above, Harbor Freight commenced an ineffective recall that was calculated to result in few returns, and generally no refunds, thereby protecting profits Harbor Freight collected from selling the defective products.

94.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and Class members for its unjust enrichment, as ordered by the Court.

## COUNT V

**(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790 *et seq*. and California Commercial Code § 2314)**

95.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

96.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant.

97.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, et seq., and California Commercial Code § 2314, every sale of consumer goods in this State is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in this State is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose (here, to be used as chainsaws) and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

98.   The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

99.   Plaintiffs and the Class members who purchased one or more of the Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

100.   Defendant is in the business of manufacturing, assembling, producing and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

101.   Defendant impliedly warranted to retail buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used.  In order for a consumer good to be "merchantable" under the Act, it must satisfy both of these elements.  Defendant breached these implied warranties because the Products were unsafe and defective.  Therefore, the chainsaws would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

102.   Defendant was in vertical privity with Plaintiffs and class members because it sells its products directly to consumers in Harbor Freight stores and on the Harbor Freight website.

103.   Plaintiffs and Class members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Products.

104.   The Products were not altered by Plaintiffs or Class members.

105.   The Products were defective at the time of sale when they left the exclusive control of Defendant.  The defect described in this complaint was latent in the product and not discoverable at the time of sale.

106.   Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and Class members.

107.   Although Defendant's express warranty purportedly included a disclaimer, the disclaimer was legally insufficient to bar this claim.  First, under

section 1792.3 of the Song–Beverly Act, implied warranties of merchantability and fitness may only be waived when the sale of consumer goods is made on an "as is" or "with all faults" basis.  The Products were not sold on an "as is" or "with all faults" basis, and the disclaimer made no mention of the sale being "as is" or "with all faults."  Second, under the California Commercial Code, a disclaimer of implied warranties is effective only if it is "conspicuous" and made available to the consumer prior to the sale of the product.  The disclaimer was made on the last page of the owner's manual, which was tucked away inside the sealed box containing the chainsaw.  No disclaimer was included in the product packaging viewable to consumers when they made their purchase decisions.

108.   As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because they would not have purchased the Products if they knew the truth about the products, namely, that they were unfit for use as chainsaws.

## COUNT VI
### (Violation Of The Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*)

109.   Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

110.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

111.   The Products are consumer products as defined in 15 U.S.C. § 2301(1).

112.   Plaintiffs and the Class and Subclass members are consumers as defined in 15 U.S.C. § 2301(3).

113.   Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

114.   In connection with the marketing and sale of the Products, Defendant impliedly warranted that the Products were fit for use as chainsaws.  The Products were not fit for use as chainsaws due to the defect described in the allegations above.

115.   By reason of Defendant's breach of warranties, Defendant violated the statutory rights due Plaintiffs and the Class and Subclass members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiffs and the Class and Subclass members.

116.   Plaintiffs and the Class and Subclass members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Products if they knew the truth about the defective nature of the Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.   For an order certifying the nationwide Class and California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Subclass and Plaintiffs' attorneys as Class Counsel to represent the Class and Subclass members;

b.   For an order declaring the Defendant's conduct violates the statutes referenced herein;

c.   For an order finding in favor of Plaintiffs, the nationwide Class, and the Subclass on all counts asserted herein;

d.   For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.   For pre-judgment interest on all amounts awarded;

f.   For an order of restitution and all other forms of monetary relief;

g.   For an order awarding Plaintiffs and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  June 17, 2019

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:_____ */s/ Joel D. Smith*_____
              Joel D. Smith

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
        jsmith@bursor.com
        breed@bursor.com

*Counsel for Plaintiffs*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Joel D. Smith, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs in this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under California Civil Code Section 1780(d) because Defendant does business in this county and/or a substantial portion of the transactions at issue occurred in this county.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed at Walnut Creek, California on June 17, 2019.

_____
Joel D. Smith