**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
          jsmith@bursor.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILL KAUPELIS and FRANK ORTEGA, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>    v.<br><br>HARBOR FREIGHT TOOLS USA, INC.,<br><br>                  Defendant. | Case No. 8:19-cv-01203-JVS-DFM<br><br>**DECLARATION OF ALEC M. LESLIE IN SUPPORT OF PLAINTIFFS' REPLY MEMORANDIM OF LAW ISO CLASS CERTIFICATION**<br><br>Date:         June 1, 2020<br>Time:        1:30 p.m.<br>Courtroom:  10C<br>Judge:     Hon. James V. Selna |

### REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

I, Alec M. Leslie, declare as follows:

1. I am over the age of 18 and I submit this declaration in support of Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2. On the same day Plaintiffs filed their motion for class certification on March 2, 2020, and again in later productions, Defendant produced numerous relevant documents, including, for example, Exhibits 2-38 and Exhibit 40, listed below.

3. Attached hereto as **Exhibit 1** is a timeline compiled by Plaintiffs' counsel detailing Defendant's knowledge of the defect at issue in chronological order, dating back over 4 and a half years before Defendant issued its recall. Exhibit 1 is comprised of customer complaints received by Defendant as well as Defendant's own internal communications concerning the defect at issue.

4. Attached hereto as **Exhibit 2** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002526. This document is filed under seal.

5. Attached hereto as **Exhibit 3** is a true and correct copy Defendant's internal correspondence discussing customer complaints regarding the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_KO_0003228. This document is filed under seal.

6. Attached hereto as **Exhibit 4** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0003217. This document is filed under seal.

7. Attached hereto as **Exhibit 5** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant

has designated "Confidential" and Bates marked HFT_K&O_0002768.  This document is filed under seal.

8.      Attached hereto as **<u>Exhibit 6</u>** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002806.  This document is filed under seal.

9.      Attached hereto as **<u>Exhibit 7</u>** is a true and correct copy Defendant's internal correspondence discussing the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_KO_0003228.  This document is filed under seal.

10.     Attached hereto as **<u>Exhibit 8</u>** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002415.  This document is filed under seal.

11.     Attached hereto as **<u>Exhibit 9</u>** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002809.  This document is filed under seal.

12.     Attached hereto as **<u>Exhibit 10</u>** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002835.  This document is filed under seal.

13.     Attached hereto as **<u>Exhibit 11</u>** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002825.  This document is filed under seal.

14.     Attached hereto as **<u>Exhibit 12</u>** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, and Defendant's

internal correspondence discussing the same, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002766.  This document is filed under seal.

15.    Attached hereto as **Exhibit 13** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002831.  This document is filed under seal.

16.    Attached hereto as **Exhibit 14** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002824.  This document is filed under seal.

17.    Attached hereto as **Exhibit 15** is a true and correct copy of a customer complaint and summons for a personal injury lawsuit concerning the product defect at issue captioned *Burgard v. Chicago Electric Power Tools and Harbor Freight Tools USA, Inc.*, Case No. 37-20I7-00000155-CU-EL-NC (Super. Ct. San Diego Cnty. 2017).  Defendant has designated this document as "Confidential" and Bated marked it HFT_K&O_0002445.  This document is filed under seal.

18.     Attached hereto as **Exhibit 16** is a true and correct copy of Defendant's internal Quality Assurance analysis concerning issues with the product, including the trigger defect, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002801.  This document is filed under seal.

19.    Attached hereto as **Exhibit 17** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002820.  This document is filed under seal.

20.    Attached hereto as **Exhibit 18** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant

has designated "Confidential" and Bates marked HFT_K&O_0002810. This document is filed under seal.

21.     Attached hereto as **<u>Exhibit 19</u>** is a true and correct copy of Defendant's internal correspondence of a customer complaint regarding the defect and Defendant's internal monitoring of the same, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002770. This document is filed under seal.

22.     Attached hereto as **<u>Exhibit 20</u>** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002876. This document is filed under seal.

23.     Attached hereto as **<u>Exhibit 21</u>** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002874. This document is filed under seal.

24.     Attached hereto as **<u>Exhibit 22</u>** is a true and correct copy of Defendant's internal correspondence discussing customer complaints regarding the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002764. This document is filed under seal.

25.     Attached hereto as **<u>Exhibit 23</u>** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002883. This document is filed under seal.

26.     Attached hereto as **<u>Exhibit 24</u>** is a true and correct copy of Defendant's internal correspondence concerning Quality Assurance testing of the product at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0003446. This document is filed under seal.

27.     Attached hereto as **Exhibit 25** is a true and correct copy of Defendant's internal correspondence concerning an analysis of the most common complaints for the product at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002890.  This document is filed under seal.

28.     Attached hereto as **Exhibit 26** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002907.  This document is filed under seal.

29.     Attached hereto as **Exhibit 27** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002906.  This document is filed under seal.

30.     Attached hereto as **Exhibit 28** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002897.  This document is filed under seal.

31.     Attached hereto as **Exhibit 29** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002910.  This document is filed under seal.

32.     Attached hereto as **Exhibit 30** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002911.  This document is filed under seal.

33.     Attached hereto as **Exhibit 31** is a true and correct copy of Defendant's internal correspondence identifying the cause of the defect at issue and describing results of internal testing, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002852.  This document is filed under seal.

34.     Attached hereto as **Exhibit 32** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002911.  This document is filed under seal.

35.     Attached hereto as **Exhibit 33** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, and Defendant's internal correspondence discussing the same, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0003274.  This document is filed under seal.

36.     Attached hereto as **Exhibit 34** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002398.  This document is filed under seal.

37.     Attached hereto as **Exhibit 35** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, and Defendant's internal correspondence discussing the same, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002968.  This document is filed under seal.

38.     Attached hereto as **Exhibit 36** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002967.  This document is filed under seal.

39.     Attached hereto as **Exhibit 37** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0002436.  This document is filed under seal.

40.     Attached hereto as **Exhibit 38** is a true and correct copy of a customer complaint received by Defendant concerning the defect at issue, which Defendant

1  has designated "Confidential" and Bates marked HFT_K&O_0002976.  This

2  document is filed under seal.

3       41.    Attached hereto as **<u>Exhibit 39</u>** is a true and correct copy of a customer

4  complaint received by Defendant concerning the defect at issue, and Defendant's

5  correspondence with the customer, which Defendant has designated "Confidential"

6  and Bates marked HFT_K&O_0001327.  This document is filed under seal.

7       42.    Attached hereto as **<u>Exhibit 40</u>** is a true and correct copy of a customer

8  complaint received by Defendant concerning the defect at issue, which Defendant

9  has designated "Confidential" and Bates marked HFT_K&O_0002439.  This

10 document is filed under seal.

11      43.    Attached hereto as **<u>Exhibit 41</u>** is a true and correct copy of the Rebuttal

12 Declaration of Dr. John M. Tobias, Ph.D, PE.  This document is filed under seal.

13      44.    Attached hereto as **<u>Exhibit 42</u>** is a true and correct copy of

14 correspondence between Defendant and the Consumer Product Safety Commission

15 ("CPSC") concerning language to be used in Defendant's recall, which Defendant

16 has designated "Confidential" and Bates marked HFT_K&O_0003421.  This

17 document is filed under seal.

18      45.    Attached hereto as **<u>Exhibit 43</u>** is a true and correct excerpt of an excel

19 spreadsheet Defendant produced detailing sales records for the product in the state of

20 California, which Defendant has designated as "Confidential."  Defendant produced

21 similar sales data on a state-by-state basis, which shows that far more than 40 units

22 were sold within each of the proposed classes.  This document is filed under seal.

23      46.    Attached hereto as **<u>Exhibit 44</u>** is a true and correct copy of Defendant's

24 Customer Service Script concerning Defendant's recall, which Defendant has

25 designated "Confidential" and Bates marked HFT_K&O_0003102.  This document

26 is filed under seal.

27      47.    Attached hereto as **<u>Exhibit 45</u>** is a true and correct copy of a customer

28 complaint received by Defendant concerning Defendant's recall, which Defendant

has designated "Confidential" and Bates marked HFT_K&O_0003409.  This document is filed under seal.

48.     Attached hereto as **Exhibit 46** is a true and correct copy of a customer complaint received by Defendant concerning Defendant's recall, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0003408.  This document is filed under seal.

49.     Attached hereto as **Exhibit 47** is a true and correct copy of a customer complaint received by Defendant concerning Defendant's recall, which Defendant has designated "Confidential" and Bates marked HFT_K&O_0003398.  This document is filed under seal.

50.     Attached hereto as **Exhibit 48** is a true and correct copy of the Rebuttal Declaration of Colin B. Weir.

51.     Attached hereto as **Exhibit 49** is a true and correct copy of a customer complaint submitted to the CPSC concerning the defect at issue.

52.     Attached hereto as **Exhibit 50** is a true and correct copy of excerpts of the deposition of Rick Reyes, a Harbor Freight employee, taken in this case.

53.     Attached hereto as **Exhibit 51** is a true and correct copy of excerpts of the deposition of Dirk Duffner, taken in this case.

54.     Attached hereto as **Exhibit 52** is a true and correct copy of excerpts of the deposition of Harbor Freight's 30(b)(6) witness Casper Wypych, taken in this case.

55.     Attached hereto as **Exhibit 53** is a true and correct copy of a customer complaint submitted to the CPSC concerning the defect at issue.

56.     Attached hereto as **Exhibit 54** is a true and correct copy of Plaintiffs' First Set of Interrogatories to Defendant, served on August 7, 2019.

57.     Attached hereto as **Exhibit 55** is a true and correct copy of excerpts of the deposition of Plaintiff Frank Ortega, taken in this case.

58.     Attached hereto as **Exhibit 56** is a true and correct copy of excerpts of the deposition of Colin B. Weir, taken in this case.

59.     Attached hereto as **Exhibit 57** is a true and correct copy of excerpts of the deposition of Joseph Mohorovic, taken in this case.

60.     Attached hereto as **Exhibit 58** is a true and correct copy of excerpts of the deposition of Harbor Freight's 30(b)(6) witness Danielle Cugini, taken in this case.

61.     Attached hereto as **Exhibit 59** is a true and correct copy of a Notice Letter pursuant to the CLRA and U.C.C. §§ 2-313, 2-314, sent to Defendant on May 7, 2019.

62.     Attached hereto as **Exhibit 60** is a true and correct copy of excerpts of the deposition of Jonathan Tomlin, taken in this case.

63.     Attached hereto as **Exhibit 61** is a true and correct copy of the rough deposition transcript of the deposition of Robert Zeithammer, taken in this case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 8, 2020, in New York, New York.

_____
Alec M. Leslie

**EXHIBITS 1 - 48 FILED UNDER SEAL**

**EXHIBIT 49**

This is a copy of your Report to the U.S. Consumer Product Safety Commission submitted on 11/17/2017

## Incident Details

| | |
|---|---|
| Document Number: | I17B0584A |
| Report Number: | 20171117-04B9B-2147395307 |
| Report Submitted Date: | 11/17/2017 |
| Who You Are: | Consumer |
| Incident Description: | I plugged in my electric corded chainsaw and it turned on immediately, without the safety button or trigger button pressed. I could have been seriously injured. After I unplugged it to turn it off, I tried safely plugging it in, and it turned back on. I tried pressing the safety button and trigger button to try to toggle it off, but the buttons weren't of any use, it kept going full speed no matter what. The only way I could turn it off was unplugging it. |
| | I reported it to Harbor Freight (makers of Chicago Electric chainsaws) and how I could have seriously been injured and the rep said not to plug it in and they would send me a replacement switch... A dangerous object like that shouldn't even have the potential to be shorted and start without any human interaction. |
| Incident Date: | 11/16/2017 |
| Incident Location: | |

## Product Details

| | |
|---|---|
| Product Description: | https://www.youtube.com/watch?v=6v0ymz_n-hg This chainsaw. Chicago Electric 14 inch chain saw. Item #67255 I believe. |
| Product Category: | Yard & Garden |
| Product Type: | Gardening & Landscaping |
| Brand Name: | Chicago Electric |
| Manufacturer / Importer / Private Labeler Name: | Harbor Freight |
| Model Name or Number: | |
| Serial Number: | |
| Date Manufactured: | |
| Manufacturer Date Code: | |
| Manufacturer Address: | Not specified |
| Manufacturer Website URL: | |
| Manufacturer Phone Number: | |
| Retailer: | |
| Retailer State: | |

**Additional Details**

---

**CPSC does not guarantee the accuracy, completeness, or adequacy of the contents of the Publicly Available Consumer Product Safety Information Database on SaferProducts.gov, particularly with respect to information submitted by people outside of CPSC.**

Purchase Date:

I still have the   Yes
product in my
possession.

The product   No
was damaged
before the
incident.

The product   No
was modified
before the
incident.

Have you   Yes
contacted the
manufacturer?

If not, do you   N/A
plan to contact
them?

Explanation:   Explained in one of my paragraphs

| Your Contact Information | |
|---|---|
| First Name: | (b)(6) |
| Last Name: | |
| Address: | |
| E-mail | |
| Phone Number: | |
| Consent | |

May we include   No, do not include my Report on SaferProducts.gov.
your Report,
including any
documents or
photographs
that you have
attached to
your Report,
but without
your name and
contact
information, in
CPSC's Public
Database?

May we release   Yes, you may release my name and contact information to the product manufacturer /importer /
your name and   private labeler.
contact
information to
the product
manufacturer /
importer /
private labeler
identified in
your Report?

**CPSC does not guarantee the accuracy, completeness, or adequacy of the contents of the Publicly
Available Consumer Product Safety Information Database on SaferProducts.gov, particularly with
respect to information submitted by people outside of CPSC.**

I certify that I  Yes
have reviewed
the Report and
that the
information
provided in this
Report is true
and accurate to
the best of my
knowledge,
information,
and belief.

**OMB Control Number 3041-0146**

**CPSC does not guarantee the accuracy, completeness, or adequacy of the contents of the Publicly Available Consumer Product Safety Information Database on SaferProducts.gov, particularly with respect to information submitted by people outside of CPSC.**

**EXHIBIT 50**

```
 1                UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4      _____
                                )
 5      WILL KAUPELIS and FRANK  )
        ORTEGA, individually and )
 6      on behalf of all others  )
        similarly situated,      )
 7                               )
                 Plaintiffs,     )
 8                               )
        vs.                      ) No. 8:19-cv-01203-JVS-DFM
 9                               )
        HARBOR FREIGHT TOOLS     )
10      USA, INC.,               )
                                 )
11               Defendant.      )
                                 )
12      _____)
13
14
15          VIDEOTAPED DEPOSITION OF RICK REYES
16               Camarillo, California
17              Thursday, June 25, 2020
18                    Volume I
19
20
21      Reported by:
        CATHERINE A. RYAN, RMR, CRR
22      CSR No. 8239
23      Job No. 4130051
24
25      PAGES 1 - 88
```

Page 1

1      Q    Have you ever attended any presentations          09:12:12

2   or classes on what to do when a customer complains

3   about a potential safety hazard?

4      A    No, sir.

5      Q    Are you aware of any coworkers at Harbor           09:12:22

6   Freight who received any training about what to do

7   when a customer complains about a potential safety

8   defect?

9      A    No, sir.

10      Q    In your experience at Harbor Freight --           09:12:34

11   strike that.

12           In your experience, is it Harbor Freight's

13   policy to take customer complaints about safety

14   hazard seriously?

15      A    Yes, sir.                                         09:12:58

16      Q    Now, in your time working at Harbor

17   Freight, you have, on occasion, received information

18   about customers complaining about potential safety

19   hazards.

20           Is that -- is that a true statement?             09:13:20

21      A    That would be correct.

22      Q    Okay.  When it happens, is it your general

23   practice to assume customers are lying when they

24   complain about a safety hazard?

25      A    No, sir.                                          09:13:29

                                                              Page 18

|    |    |    |
|----|----|----|
| 1  | Q    Has management at Harbor Freight ever told | 09:13:30 |
| 2  | you that you should assume customers are lying or | |
| 3  | mistaken when they complain about a safety hazard? | |
| 4  | A    Never. | |
| 5  | Q    If you were to receive a complaint from a | 09:13:47 |
| 6  | customer that makes you think that maybe a re-call | |
| 7  | might be needed -- if that -- if that were to | |
| 8  | happen, would you be permitted to contact upper | |
| 9  | management at Harbor Freight and tell them that? | |
| 10 | MR. HERLING:  Objection.  Incomplete | 09:14:08 |
| 11 | hypothetical.  Calls for speculation. | |
| 12 | BY MR. SMITH: | |
| 13 | Q    Mr. Reyes, you can answer the question. | |
| 14 | A    Question again, please. | |
| 15 | Q    Sure. | 09:14:29 |
| 16 | Assume you receive a complaint from a | |
| 17 | customer that, for whatever reason, makes you think | |
| 18 | that a re-call might be needed. | |
| 19 | If that were to happen, are you permitted | |
| 20 | to reach out to Mr. Valenzuela, for instance, and -- | 09:14:44 |
| 21 | and tell him that you have a concern that a re-call | |
| 22 | may be warranted? | |
| 23 | MR. HERLING:  Objection.  Incomplete | |
| 24 | hypothetical. | |
| 25 | THE WITNESS:  I would advise my immediate | 09:15:06 |

Page 19

```
  1    look at it, and we'll -- we'll move forward when        09:36:13

  2    you're ready.

  3              (Pause.)

  4        A    Okay.

  5        Q    Mr. Reyes, have you seen the document          09:36:58

  6    that's been marked Exhibit 72 before?

  7        A    Yes, sir.

  8        Q    The answer is "Yes"?

  9        A    Yes.

 10        Q    Okay.  What is Exhibit 72?                     09:37:06

 11        A    Excuse me?

 12        Q    What is Exhibit 72?

 13        A    It's an email sent between me and another

 14    associate.

 15        Q    I want to direct your attention to the        09:37:24

 16    earliest email in the chain on Exhibit 72.  You'll

 17    see it on the second page of Exhibit 72.

 18        A    Yes, sir.

 19        Q    Do you see that?

 20        A    Yes, sir.                                      09:37:34

 21        Q    Okay.  And that's an email from a customer

 22    describing his or her experience with the chainsaw.

 23              Is that a fair summation?

 24        A    Yes, sir.

 25        Q    And you'll notice that the communication      09:37:48
```

Page 30

```
 1    at the end -- from the customer at the end of          09:37:51

 2    Exhibit 72 has got 12 bulleted points starting with

 3    "First Name" and ending with "Browser."

 4           Do you see that?

 5    A    Yes, sir.                                           09:38:00

 6    Q    Okay.  I want to direct your attention to

 7    No. 8, which is "Comments."  And if you read that,

 8    you'll see that the customer states that they were

 9    trimming a hedge on a ladder when the saw would not

10    turn off.                                                09:38:14

11           Do you see that?

12    A    Yes, sir.

13    Q    Okay.  When you received this information

14    in June 2015, did you ever tell anyone that you

15    believe the customer must have been lying or            09:38:29

16    mistaken about the chainsaw malfunctioning when

17    they're --

18    A    No, sir.

19    Q    -- trimming a hedge?

20    A    No, sir.                                            09:38:37

21    Q    Has anyone ever told you that the customer

22    who sent the complaint shown in Exhibit 72 must have

23    been lying or mistaken when they say the chainsaw

24    malfunctioned when they were cutting a hedge?

25    A    No, sir.                                            09:38:57
```

Page 31

```
 1        Q    Have you ever told anyone that it would be       09:38:58

 2   impossible for the chainsaw power switch to

 3   malfunction in the manner described by the customer

 4   in Exhibit 72?

 5        A    No, sir.                                         09:39:05

 6        Q    Has anyone ever instructed you to keep the

 7   communication from the email about the chainsaw a

 8   secret?

 9        A    No, sir.

10        Q    Did anyone ever tell you that you should        09:39:20

11   never disclose the customer complaint in any

12   discussions outside of work?

13        A    No, sir.

14        Q    All right.  We're still on Exhibit 72.  I

15   want to direct your attention now to the email from      09:39:39

16   product support, which is on the bottom of the first

17   page of Exhibit 72.

18             Do you see that?

19        A    Yes, sir.

20        Q    Okay.  And you'll notice the email "From"       09:39:49

21   line says "Product Support," but then, underneath,

22   at the end of the email, there's a reference to

23   someone named "Rick B."

24             Do you see that?

25        A    Yes, sir.                                       09:40:02
```

Page 32

1     A    Okay.                                          10:31:24

2     Q    Have you seen Exhibit 75 before?

3     A    No, sir.

4     Q    I'm sorry.  The answer was "No"?

5     A    No.                                            10:31:32

6     Q    Okay.  Sitting here today, looking at

7  Exhibit 5 [sic], do you have any reason to doubt

8  that it is an authentic email exchange between you

9  and Ms. Van Daalen Wetters?

10     A    No.                                           10:31:48

11     Q    I want to direct your attention to

12  Ms. Van Daalen Wetters' email on the second page

13  where she states as follows:  "This is the 2nd or

14  3rd call I've received regarding the saw turning on

15  automatically when plugged into the wall and not    10:32:19

16  shutting down until unplugged."

17          Do you see that?

18     A    Yes, sir.

19     Q    Did Ms. Van Daalen Wetters ever come back

20  and tell you that the information she provided you   10:32:31

21  in this email is incorrect?

22     A    No, sir.

23     Q    Did you ever tell Ms. Van Daalen Wetters

24  that you thought the information that she provided

25  was incorrect?                                       10:32:42

                                              Page 61

```
 1        A    No, sir.                                      10:32:44

 2        Q    Did you ever tell her that the power

 3   switch cannot possibly fail in the manner described

 4   in the email shown in Exhibit 75?

 5        A    No, sir.                                      10:33:00

 6        Q    Did anyone ever tell you that the power

 7   switch cannot possibly fail in the manner described

 8   in Exhibit 75?

 9        A    No, sir.

10        Q    When you received the information shown in    10:33:14

11   Exhibit 75, did you pass it on to anyone in the

12   quality assurance department?

13        A    Not that I recall.

14        Q    Why not?

15        A    Again, at this point, it's only two or        10:33:30

16   three calls, and I felt it wasn't -- we were still

17   monitoring at that point.

18        Q    Is there any other reason you can think

19   of, sitting here today, why you did not inform

20   quality assurance about the information disclosed in   10:33:47

21   Exhibit --

22        A    Not --

23        Q    -- 75?

24        A    -- that I recall.  No, sir.

25        Q    Did you take any action after you received   10:34:02
```

Page 62

1          You'll see that's an email.  The "From"          11:02:53

2    line says "Quality," but, below that, it appears to

3    be an email from Mr. Tucker.

4          Does that appear to be correct to you?

5    A    Yes, sir.                                          11:03:01

6    Q    And does it also appear to you that

7    Exhibit 79 is discussing -- or addressing potential

8    problems with the trigger on the chainsaws that you

9    were monitoring?

10   A    Yes, sir.                                          11:03:24

11   Q    So I want to call your attention to

12   Mr. Tucker's email at the top of the first page of

13   Exhibit 79.

14         You'll see it starts:  "Hello Andrew," and

15   a few lines below that, he states as follows:          11:03:40

16   "Quality will watch this item for trigger issues."

17         Do you see that?

18   A    Yes, sir.

19   Q    And sitting here today, do you have any

20   reason to think Mr. Tucker was -- was not being        11:03:57

21   truthful when he said that quality was watching the

22   train saws -- the chainsaws for trigger issues?

23   A    No, sir.

24   Q    When you were monitoring the chainsaws in

25   2015 and '16, were you doing that as part of a         11:04:11

Page 77

| | | |
|---|---|---|
| 1 | coordinated effort with Mr. Tucker, or were you both | 11:04:16 |
| 2 | operating independently of each other? | |
| 3 | A    Independently. | |
| 4 | Q    Okay.  So in 2015, you were monitoring the | |
| 5 | chainsaws on your own, correct? | 11:04:30 |
| 6 | A    Yes, sir. | |
| 7 | Q    Okay.  And -- and at least, apparently, | |
| 8 | based on this email on Exhibit 79, quality assurance | |
| 9 | department was also monitoring the chainsaws. | |
| 10 | Is that a fair assumption? | 11:04:43 |
| 11 | A    Yes, sir. | |
| 12 | Q    Do you know anyone named Joel Gonepogu. | |
| 13 | First name is J-o-e-l.  Second name is | |
| 14 | G-o-n-e-p-o-g-u? | |
| 15 | A    No, sir. | 11:05:03 |
| 16 | Q    Were you monitoring the chainsaws in 2017? | |
| 17 | A    Pardon me? | |
| 18 | Q    Were you monitoring the chainsaws in 2017? | |
| 19 | A    2007? | |
| 20 | Q    '17. | 11:05:26 |
| 21 | A    '17.  I'm sorry.  Yes, sir. | |
| 22 | Q    Okay.  When you were monitoring the | |
| 23 | chainsaws in 2017, did anyone at Harbor Freight tell | |
| 24 | you that the chainsaws had been tested and they | |
| 25 | determined they had some problems with the switches? | 11:05:41 |

Page 78

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were administered an oath; that

8   a record of the proceedings was made by me using

9   machine shorthand which was thereafter transcribed

10  under my direction; that the foregoing is a true

11  record of the testimony given.

12       Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [  ] was [ X ] was not requested.

16        I further certify that I am neither

17  financially interested in the action nor a relative

18  or employee of any attorney or any party to this

19  action.

20       IN WITNESS WHEREOF, I have this date

21  subscribed my name:  July 15, 2020.

22

23                    _Catherine A. Ryan_

24

                      Catherine A. Ryan, RMR, CRR

25                    CSR No. 8239

                                            Page 88

Veritext Legal Solutions
866 299-5127

**EXHIBIT 51**

```
 1                  UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
 2

 3       WILL KAUPELIS and FRANK ORTEGA, )
         individually and on behalf of   )
 4       all others similarly situated,  )
                                         )
 5                   Plaintiffs,         ) Case No.
                                         ) 8:19-cv-01203-JVS-DFM
 6            -vs-                        )
                                         )
 7       HARBOR FREIGHT TOOLS USA, INC., )
                                         )
 8                   Defendant.          )
 9

10            Videotaped deposition of DIRK H. DUFFNER, taken

11       remotely via Zoom video conference before Donna L.

12       Policicchio, C.S.R., and Notary Public, pursuant to

13       the Federal Rules of Civil Procedure for the United

14       States District Courts pertaining to the taking of

15       depositions, at 50 West Summit Drive, Emerald Hills,

16       California, commencing at 8:57 a.m., Pacific Time, on

17       the 13th day of August, 2020.

18

19

20

21

22

23

24

25

                                                    Page 1
```

```
 1            MR. SMITH:  Close the video?  Oh, yeah, go ahead,

 2      go ahead.

 3                  (Exhibit 91 was marked.)

 4      BY MR. SMITH:

 5         Q    Okay.  I just marked Exhibit 91, which

 6      hopefully you have access to.

 7         A    Yep.

 8         Q    Do you recognize Exhibit 91?

 9         A    Yep, those are my notes, yes.

10         Q    Okay.  And those are the notes you were just

11      referencing when you're answering some of the

12      questions I had about your interview with Mr. Wypych?

13         A    Yes, those first two pages there, yes.

14         Q    Okay.  I want to direct your attention to the

15      second page of Exhibit 91.

16         A    Okay.

17         Q    Maybe just above the halfway mark you have a

18      note.  It looks like it says YAT saws are bad, not

19      SUMEC.

20              Am I reading that correctly?

21         A    Yes.

22         Q    Okay.  Did someone at Harbor Freight during

23      the interview tell you that YAT saws are bad?

24         A    It's kind of my shorthand to help distinguish

25      between the YAT and the SUMEC.
```

                                                    Page 82

1          Q    Okay.

2          A    The YAT saws were the ones that were

3     exhibiting the -- I mean, it's hard to write all

4     those words.  So the YAT saws were the ones that were

5     exhibiting the fusing of the contacts and the SUMEC

6     were not.

7          Q    Okay.  Who told you that?

8          A    No one told me that.  I got that from the

9     reports.

10         Q    From -- okay.  Did the subject of the YAT

11    saws being bad come up in your conversation with

12    Mr. Wypych?

13         A    Yeah, I wrote it right here, yeah.

14         Q    Okay.  So what did --

15         A    My shorthand is bad, but, I mean, bad is such

16    a strong word.

17         Q    Did Mr. Wypych tell you the YAT saws were

18    just fine?

19         A    Well, no.  I mean, I think the ones he tested

20    were -- demonstrated he was able to recreate the

21    failure mode so --

22         Q    Okay.  What did Mr. Wypych tell you that

23    prompted you to write on page 2 of Exhibit 91 that

24    the YAT saws are bad?

25         A    He didn't tell me anything.  I just got that

Page 83

```
 1        from me reading his reports.  That's not me writing
 2        what he said.  That's me like putting some reference
 3        mark to distinguish YAT from SUMEC.
 4            Q    Okay.  Let me see -- I just want to make sure
 5        I understand correctly.  The first two pages of
 6        Exhibit 91 reflect notes you took during your call
 7        with Mr. Wypych?
 8            A    Yes.
 9            Q    Okay.  And so the second page of Exhibit 91
10        where you say YAT saws are bad, that was something
11        you noted during the call with Mr. Wypych?
12            A    Right.  That was a way for me to
13        distinguish -- we're talking about YAT, SUMEC, RA.  I
14        never heard these words before, so I needed a way to
15        separate one from the other without writing a lot of
16        words.
17            Q    Okay.
18            A    So that's what I wrote.
19            Q    All right.  So my question to you is, what
20        did -- what did you hear on the call with Mr. Wypych
21        that prompted you to write YAT saws are bad?
22            A    Nothing.
23            Q    Okay.  Why did you write YAT saws are bad?
24            A    I think I answered that.  It was like
25        shorthand for me to distinguish one versus the other.
```

Page 84

1     Q   Okay.  Why --

2     A   So I could tell in my call we're talking

3   about YAT saws, SUMEC saws.  I was like, yeah, okay,

4   which one is which.

5     Q   Okay.  Why are YAT saws bad?

6     A   Why are they bad?  They're the ones that

7   failed -- they're the ones that Mr. Wypych got to

8   fail in his test, and the SUMEC ones he did not.

9     Q   Did you ever exchange any e-mails with

10   Mr. Wypych?

11     A   No.

12     Q   What was your impression of Mr. Wypych

13   overall?

14     A   He seemed like a reasonable engineer guy.  He

15   went to USC, which is kind of bad, but other than

16   that, he's fine.

17     Q   Did you have any misgivings about his

18   confidence as an engineer?

19     A   No.

20     Q   And after you spoke with him, did you have

21   any misgivings about his honesty?

22     A   No.

23     Q   Did you learn any information from your

24   interview with Mr. Wypych that you didn't already

25   know from looking at the various documents described

Page 85

1          Q    Okay.  Are the notes that you were just

2     looking at notes that were produced in this case?

3          A    Yes.

4          Q    What's the rating for a Jiaben Electronics

5     MSE-11B -- I'm sorry -- 115B switch?

6          A    15 amps.

7          Q    And what is the rating for a Jiaben

8     Electronics MSB, as in boy, -1115B switch?

9          A    15 amps.

10         Q    And do you agree that the Harbor Freight

11    chainsaws at issue in this case can exceed 15 amps?

12         A    I think it's pretty obvious, right.

13         Q    Do you know what derating is?

14         A    Yes.

15         Q    What is derating?

16         A    So under certain conditions, certain

17    products, certain devices, certain things under

18    certain conditions of use will have lower ratings for

19    usage than they may have for other conditions of use.

20    It kind of goes to that duty cycle thing I was

21    talking about.  Depending on the specific duty, you

22    may derate certain components.  It comes up in

23    various designs of products and whatnot.

24         Q    Okay.  As a general principle and holding all

25    other things equal, do you agree or disagree that

Page 117

```
 1          THE VIDEOGRAPHER:  Mr. Duffner, would you be able
 2     to tilt your camera down.  You're starting to fall
 3     all the way down on the bottom of your screen.
 4          THE WITNESS:  Really?
 5          THE VIDEOGRAPHER:  Or you can just sit up.
 6          THE WITNESS:  It's like slouching.  Sorry.  How
 7     is that?
 8          MR. SMITH:  It's fine by me.  And, Mr. Duffner,
 9     be comfortable.  Feel free to slouch if you like.
10          THE WITNESS:  Sorry.
11     BY MR. SMITH:
12          Q   If someone were using one of the subject
13     chainsaws, and I'm talking pre-recall, and it binds,
14     would you generally expect people to let up on the
15     switch at that moment or keep pressing the switch?
16          MR. HERLING:  Objection.  Incomplete -- or
17     objection as to form.
18          A   You mean that it binds in the middle of a
19     cut?
20     BY MR. SMITH:
21          Q   Yeah.
22          A   Yeah.  I would expect that you let go of the
23     switch and you yank it out of the cut.  At least
24     that's what I've done.
25          Q   Prior to the recall, do you know if it was
```

                                        Page 123

```
 1        possible to physically, if one wanted to, swap out

 2        the switch -- the power switch that was in the YAT

 3        saw and the power switch that was in the SUMEC saw?

 4        So, in another way, were they interchangeable?

 5            A   I don't -- they look interchangeable, but I

 6        would have to -- no one has asked me that.  Let me

 7        look at the Power Point.  Hold on.  Are the switch

 8        contacts in the same spot?  Let me look.

 9                They look interchangeable, yes.

10            Q   Generally when you -- when you have a switch

11        and you open and close it, would you expect an arc to

12        be formed?

13            A   That certainly happens, yes.

14            Q   And can the arc that is formed when you open

15        and close a switch result in heating or melting of

16        the contacts of the switch?

17            A   Yes.  Yeah, it can.

18            Q   What about when a switch is in the chainsaw

19        and it's vibrating from the chainsaw being used,

20        could an arc be created in that scenario?

21            A   Depends on the stiffness.  I would think the

22        switch would be vibration rated.  So I would think

23        probably not.  That would be pretty bad I would think

24        to have a switch perform that way.

25                THE REPORTER:  I'm sorry.  I didn't hear the last
```

Page 124

1    STATE OF ILLINOIS      )

                            )  ss:

2    COUNTY OF C O O K      )

3

4         The within and foregoing deposition of the

5    aforementioned witness was taken before DONNA L.

6    POLICICCHIO, C.S.R., and Notary Public, at the place,

7    date, and time aforementioned.

8         There were present during the taking of the

9    deposition the previously named counsel.

10        The said witness was first duly sworn and was

11   then examined upon oral interrogatories; the

12   questions and answers were taken down in shorthand by

13   the undersigned, acting as stenographer and Notary

14   Public; and the within and foregoing is a true,

15   accurate, and complete record of all of the questions

16   asked of and answers made by the aforementioned

17   witness, at the time and place hereinabove referred

18   to.

19        The signature of the witness was not waived,

20   and the deposition was submitted, pursuant to Rules

21   30(e) and 32(d) of the Rules of Civil Procedure for

22   the United States District Court, to the deponent per

23   copy of the attached letter.

24        The undersigned is not interested in the within

25   case, nor of kin or counsel to any of the parties.

Page 132

1          Witness my official signature and seal as

2     Notary Public in and for Cook County, Illinois, on

3     this 17th day of August, 2020.

4

5

6

7

8                    _Donna L. Policicchio_

9

                 DONNA L. POLICICCHIO, C.S.R.

10               License No. 084-003740

                 Notary Public

11               One North Franklin Street

                 Suite 3000

12               Chicago, Illinois 60606

                 Phone:  (312) 442-9087

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 133

**EXHIBIT 52**

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4    WILL KAUPELIS and FRANK      )

5    ORTEGA, individually and     )

6    on behalf of all others      )

7    similarly situated,          )

8              Plaintiffs,        )

9        vs.                      ) Case No. 8:19-cv-01203-

10   HARBOR FREIGHT TOOLS USA,    )         JVS-DFM

11   INC.,                        )

12             Defendant.         )

13   _____)

14

15      VIDEOTAPED DEPOSITION OF CASPER WYPYCH

16             Van Nuys, California

17           Wednesday, January 29, 2020

18

19   REPORTED BY:

20   Dayna Michelle Glaysher

21   CSR No. 13079

22   RPR, CRR No. 28081

23   JOB No. 3837294

24

25   PAGES 1 - 60

                                        Page 1

1    make sense to you?

2        A.  You know, I don't have these documents memorized

3    verbatim.  I would probably have to have them in front

4    of me, and I could analyze them a little bit further.

5    But I just recall as I sit here today that the incidents        01:52:43

6    seemed suspect based upon the testing that I had done on

7    this chainsaw.

8        Q.  Okay.  But to be clear, sitting here today you're

9    not able to provide any specifics about that?

10       A.  Well, in the Ortega case I do believe, if I           01:52:55

11   recall correctly, he stated that he used the saw for the

12   first time.  And I do believe he stated for under two

13   minutes.  And the saw continued to operate despite him

14   letting go of the trigger.

15           And based upon all of my testing on all of the        01:53:24

16   saws that I have done at Harbor Freight, I never found a

17   case that presented itself that quickly on a brand new

18   item.

19       Q.  How many -- how many chainsaws did you evaluate

20   before determining that the -- let me strike that.           01:53:40

21           So do I understand then your view, if the problem

22   of the chainsaw not turning off was going to manifest,

23   it would be more likely than not to happen not on the

24   first usage but at some point later in time?

25       A.  Based upon my testing there is a very specific        01:54:00

                                                        Page 19

```
 1    set of circumstances that would cause an incident like

 2    this to happen.  And the incidents described in both

 3    depositions do not meet this criteria.  And I have

 4    tested saws in the conditions described in both

 5    depositions and did not find the issue to present        01:54:21

 6    itself.

 7        Q.  Okay.  What specific conditions are you referring

 8    to?

 9        A.  Under which case?  I don't follow your question.

10    I'm sorry.                                               01:54:28

11        Q.  So I think if I heard you correctly, you

12    testified a moment ago that the -- the problem of the

13    chainsaws not turning off would arise under specific

14    conditions.

15        A.  Yes.                                             01:54:48

16        Q.  Okay.  What are the specific conditions?

17        A.  Specific conditions that I found the issue to

18    present itself were under situations where the saw was

19    under a continuous stall or stalled multiple times

20    within a short time frame after being used for estimate  01:55:11

21    roughly ten minutes of excessive use.

22        Q.  What do you mean by excessive use?

23        A.  So if you push the saw and intentionally try --

24    push it harder than the pace that it would cut itself.

25    Meaning if you take the chainsaw and apply a small       01:56:04
```

Page 20

```
 1    somewhere?

 2        A.  Yes, I believe it is.

 3        Q.  Okay.  And would it be relatively easy to

 4    retrieve and produce?

 5        A.  Yes.                                     02:06:31

 6        Q.  Is there any reason it could not have been

 7    produced before today?

 8             MR. HERLING:  Well, objection.  Calls for

 9    speculation.

10             You can answer.                          02:06:40

11             THE WITNESS:  As I sit here today I don't

12    know the answer to that question.

13    BY MR. SMITH:

14        Q.  Okay.  Okay.  Would you please take a look at the

15    document that was previously marked Exhibit 9.    02:07:22

16        Have you seen Exhibit 9 before?

17        A.  Yes, I believe so.

18        Q.  Okay.  Was Harbor Freight able to identify the

19    cause of the problem that's described in Exhibit 9?

20        A.  Yes.                                     02:08:06

21        Q.  What was the cause of the problem?

22        A.  The problem stemmed from the saw being used in a

23    particular circumstance, specific circumstance.  That if

24    the saw was subjected to what I call continuous stall or

25    multiple stalls, the current required by the motor to    02:08:37
```

Page 27

```
 1    turn in that specific circumstance spikes up really

 2    high, causing excess heat to build up in the electrical

 3    system.

 4        Q.  How did you determine that was the cause of the

 5    problem?                                              02:09:02

 6        A.  Through testing product.

 7        Q.  Okay.  The 15 chainsaws that you described

 8    before?

 9        A.  Yes.

10        Q.  Anything else?                                02:09:13

11        A.  No.  That is how I identified the problem.

12        Q.  Were you the one who was primarily responsible

13    for identifying the cause or the problem that's

14    described in Exhibit 9?

15        A.  Yes.                                          02:09:29

16        Q.  Did anyone work with you on that effort?

17        A.  I had two product testers that worked with me in

18    testing units.

19        Q.  And what are those people's names?

20        A.  Tyler Hager and Brandon Yulchy.               02:09:46

21        Q.  Are they regular employees of Harbor Freight?

22        A.  What do you mean by regular?

23        Q.  Are they -- I'm just asking if they're employed

24    by Harbor Freight.

25        A.  Yes, they are.                                02:10:01
```

                                                        Page 28

1     Q.  Okay.  As a mechanical engineer, does the

2  proposal that YAT made regarding the fix seem sensible

3  to you?  I mean putting aside the testing.

4     A.  Yes.

5     Q.  Okay.  Have you considered any alternative          02:20:13

6  methods to fix the problem?

7     A.  Personally?

8     Q.  Yes.

9     A.  I really tried to not come up with solutions on

10 my own, as I feel that it would have biased my opinion    02:20:35

11 towards other opinions presented to myself.  So I did

12 not do that.

13    Q.  Pre-recall did the Portland 14 inch electric

14 chainsaws have a single-pole switch installed in them?

15    A.  Yes.                                                02:21:13

16    Q.  Post-recall were they made with a two-pole

17 switch?

18    A.  Yes.

19    Q.  And is that part of the fix that YAT proposed?

20    A.  Yes.                                                02:21:26

21    Q.  And that's a fix again that you feel is --

22 reliably resolves the problem that's described in

23 Exhibit 9?

24    A.  Yes.

25    Q.  I want to go back to some of those specific         02:21:36

Page 35

1    circumstances that you were testifying about earlier

2    that you believe are associated with the -- the

3    chainsaws not turning off.  And I want to focus not on a

4    technical level, but on -- from a practical perspective

5    what a user would do that would likely lead to the          02:22:22

6    problem.

7         Is leaning into wood while you're chopping the

8    saw one of the factors that in your view is in play?

9    A.  Yes, that could be a contributing factor.

10   Q.  Could be?                                               02:22:51

11   A.  Yes.

12   Q.  Okay.  In your view generally would the user have

13   to be using the chainsaw for some period of time before

14   the -- it became more likely that the chainsaw would not

15   turn off?                                                   02:23:10

16   A.  Based on my testing, I found that period to be

17   roughly ten minutes.

18   Q.  Okay.  In your view length of -- length of time

19   is a factor that may bear on whether or not the -- the

20   problem materialized; is that fair?                         02:23:25

21   A.  Yes.

22   Q.  So we've got two factors.

23        Are there any others?

24   A.  What two factors?

25   Q.  Leaning in on the wood and length of time.             02:23:34

                                                   Page 36

```
 1        A.   I think the most important factor is the

 2   continuous stall that I had mentioned earlier.  That is

 3   the factor that really causes the amps to climb.

 4        Q.   Can you explain what you mean by the term

 5   "continuous stall"?                                    02:23:53

 6        A.   So I'm going to throw out a scenario in which a

 7   continuous stall just to make some reference here.

 8             So let's say you're using this chainsaw,

 9   light-duty chainsaw on a very large tree branch, right.

10   I'd say just for sake of this conversation 12 inch       02:24:21

11   diameter, right.  You start using the chainsaw.

12             And as you start cutting into this wood and

13   apply, you know, pressure to it, the branch will

14   typically collapse, depending on how you're cutting it

15   and how much weight is on the end of it.  Because as     02:24:41

16   you're removing material, it will eventually pinch,

17   right.

18             So if the saw is in that situation and the wood

19   comes and pinches on the blade to the point where it

20   prevents the saw from rotating, if it stops rotating,    02:24:53

21   that's a stall.

22             And in that condition if a customer takes it and

23   just presses a trigger repeatedly to try and get the saw

24   to start moving again without moving it from the wood

25   and the situation that's causing the blade to stop from  02:25:10
```

Page 37

1    rotating, that continuous trigger pull and not having

2    the motor spin is a continuous stall.

3         In that you're applying large amounts of power to

4    the system, but the motor is incapable of turning.  That

5    specific set of circumstances is really what I            02:25:28

6    identified as the contributing factor to this problem.

7         Q.  Okay.  Is it your view that a continuous stall is

8    a necessary condition to have the problem materialize?

9         A.  Based off of my testing, yes.

10        Q.  Is that view based on anything else other than    02:25:45

11   your testing?

12        A.  I mean based on theories of how electronic

13   systems operate, yeah, that was how I was able to

14   identify it and create that test method.

15        Q.  Okay.  Can you elaborate more on the point you    02:26:09

16   just raised?

17        A.  On the theoretical aspects?

18        Q.  Yeah.

19        A.  So theoretically if you stall a motor the

20   amperage increases.  That's just how motors operate.  If  02:26:20

21   you increase the load the motor continues to try and

22   output power.  But to do that and overcome the load that

23   you're putting on it, it will draw more power from the

24   system.

25        So I thought of a case where you're trying to         02:26:38

Page 38

```
 1    draw the absolute most possible power that you can draw

 2    out of the system, and that's under that stall case.

 3    And that's why that test method was developed and

 4    implemented in testing.

 5        Q.  Okay.  Are there any other reasons you can think    02:26:53

 6    of why you believe a continuous stall is a necessary

 7    condition for the problem described in Exhibit 9 to

 8    materialize?

 9        A.  No, not at this time.

10        Q.  Okay.  Are there any documents you reviewed         02:27:09

11    before you reached that conclusion that you've just

12    described?

13        A.  No.  These are just things that I recalled from

14    my engineering education.

15        Q.  Okay.  Did you express the opinion that a           02:27:25

16    continuous stall is a prerequisite for the problem to

17    materialize to any other non-lawyer at Harbor Freight?

18        A.  Yes, to the two testers that I had testing the

19    product.

20        Q.  Did they --                                         02:27:54

21        A.  That I mentioned earlier.

22        Q.  I'm sorry, I didn't mean to interrupt.

23            Did -- so that's Tyler Hager?

24        A.  Yes.

25        Q.  And remind me the name of the other one.           02:28:01
```

Page 39

1      Q.  Where is that?

2      A.  Under the results section, the first section.

3      Q.  I see it.

4          In terms of factors that in your view may lead to

5      the chainsaws not turning off, is there anything else      02:30:29

6      you can think of besides continuous stall, leaning into

7      the wood or length of time that the product is used?

8      A.  No, not at this time.

9      Q.  Okay.  Let's go to Exhibit 36.

10         Where did you conduct the testing that's             02:31:19

11     described in Exhibit 36?

12     A.  It was done at Harbor Freight's quality assurance

13     lab.

14     Q.  And where is that lab located?

15     A.  In Calabasas, California.                             02:31:29

16     Q.  In the middle of Exhibit 36 under test protocol

17     summaries you describe testing the products on 12 to 18

18     inch diameter Ash wood rounds.

19         Do you see that?

20     A.  Yes.                                                  02:31:53

21     Q.  Is there a particular reason you chose 12 to 18

22     diameter Ash wood rounds?

23     A.  Yes.

24     Q.  What is the reason for that?

25     A.  Ash wood is one of the densest woods that's          02:32:04

Page 41

1    for that test?

2        A.  I started with a smaller extension cord.  I can't

3    remember the exact number of feet, but I think it was in

4    the range of 10 to 12 feet.  And then I went and grabbed

5    I believe our longest extension cord which we have I        02:35:23

6    think is somewhere in the range of 40 to 50 feet.  And I

7    measured the amp draw I recall on both of those cases.

8        Q.  Okay.  Did you reach any conclusion about whether

9    or not the length of the power cord used would -- was a

10   factor in terms of the problem manifesting?              02:35:58

11       A.  Despite using the 40 to 50 foot cord length, I

12   couldn't get the problem to present itself without doing

13   those three things that I had mentioned earlier.

14       Q.  Okay.

15       A.  Under normal practical use I had no issues with    02:36:18

16   the saw.

17       Q.  When you were testing the chainsaws to try and

18   figure out what circumstances would likely lead to the

19   problem described in Exhibit 9, did you review customer

20   complaints about the problem that were described to the   02:36:41

21   CPSC or posted on Harbor Freight's website?

22       A.  I believe the legal team showing me some customer

23   complaints -- I'm not entirely sure where they stemmed

24   from -- was the thing that initiated me to look into

25   this.                                                     02:37:04

                                                   Page 44

```
 1        Q.  I see.

 2            And were you able to determine whether or not the

 3     factors that you described that may lead to the problem

 4     were -- were factors that were present in the various

 5     customer complaints?                              02:37:22

 6        A.  I don't recall reading that.  But it was a very

 7     specific set of circumstances in which this failure

 8     would happen.  And I wasn't present during these

 9     customer complaints.  So I have no way of knowing

10     whether or not this happened while they were using it.  02:37:41

11        Q.  Okay.  So the very specific set of circumstances

12     that you described that you found apply to the testing

13     you did.

14            But you can't say whether or not those

15     circumstances were also present with the various      02:37:55

16     consumers who complained about the chainsaws?

17        A.   I don't recall reading that in the complaints

18     that they have.  I -- this was a while ago that I read

19     them.  I'm sorry, I don't remember them verbatim.  But

20     I -- I don't recall.                              02:38:15

21        Q.  Okay.

22        A.  Do you mind if we take a break to use the

23     restroom?

24        Q.  Absolutely.  Thank you for asking.

25            THE VIDEOGRAPHER:  We are going off the      02:38:30
```

Page 45

```
 1        Q.  Okay.  And then for the stall testing what did

 2   you do differently?

 3        A.  So the stall testing I did initially on a dyno.

 4   So you take the blade off and you mount the motor

 5   directly to the dyno.  And you can control the load      02:50:14

 6   much -- much more accurately than you can by trying to

 7   set up a situation where the blade gets pinched exactly

 8   the same time every time.  It's much more repeatable.

 9        Q.  I see.

10        Would you mind taking a look at the document that    02:50:58

11   was previously marked Exhibit 20.

12        Why don't you just take a moment to review it and

13   let me know when you've had an adequate opportunity to

14   do that.

15        A.  Yeah.                                           02:53:10

16        Q.  Okay.  I want to draw your attention to the email

17   at the top of the first page of Exhibit 20.

18        That's an email from you to Jason Sprong,

19   correct?

20        A.  Yes.                                            02:53:29

21        Q.  Okay.  And in that email you say, "In practical

22   use testing, we are easily getting over 15 amps while

23   the saw is in use."

24        Do you see that?

25        A.  Yes.                                            02:53:39
```

Page 49

1      Q.  Did I read it correctly?

2      A.  Yes.

3      Q.  What was significance of that point?

4          Why was it important for you to convey that

5      information to Jason Sprong?                        02:53:52

6      A.  Mostly because of the point made previously in

7      the previous email where he -- was it -- the vice

8      general manager of SUMEC states under section 1 of the

9      email, "Yes, it's easy to increase the amperage goes

10     over the switch rating on the testing bench but it's   02:54:14

11     very difficult on cutting."

12         That was to address that point.

13     Q.  When you say, "We are easily getting over 15 amps

14     while the saw is in use," does that have any bearing on

15     whether or not the chainsaws were likely to exhibit the  02:54:43

16     problem of not turning off?

17     A.  Yeah.  So the subsection one, the practical

18     testing that I'm referring to is the stall testing and

19     where the saw would bog down and the blade would stop

20     rotating.  In that instance I was getting the saw to    02:55:05

21     come over 15 amps and draw power.

22     Q.  And was the switch that was installed in the

23     pre-recall chainsaws not rated to exceed 15 amps?

24     A.  I believe the rating of that switch was 15 amps

25     at 125 volts.                                          02:55:36

                                                    Page 50

1       Q.   I want to draw your attention to the second page

2   of Exhibit 20.

3           There's a -- you see an email from Jason Sprong

4   at the top of the second page, correct?

5       A.   Correct.                                    02:56:15

6       Q.   Okay.  Three lines down from that email he says,

7   "The problems that arise happen when the tool draws

8   amperage above the rating on the switch causing the

9   electrical loop to fuse and the tool remain on."

10          Do you see that?                             02:56:30

11      A.   Yes.

12      Q.   Did I read that correctly?

13      A.   Yes.

14      Q.   Do you believe that's a true or a false

15  statement?                                           02:56:36

16      A.   Yes, I believe that's a true statement.

17      Q.   And below that there's an image.

18          Is that a picture of a dynograph test?

19      A.   There are two.  The one on the right is a picture

20  of a dynamometer test.                               02:57:05

21      Q.   Dynamometer.  Okay.  Thank you.

22          Do you know if the image of the test, the

23  dynamometer test is -- came from you?

24      A.   Yes, it did.

25      Q.   Do you have in your files any records or files    02:57:19

                                                         Page 51

```
 1              Certification of Court Reporter
 2                      Federal Jurat
 3
 4        I, the undersigned, a Certified Shorthand
 5   Reporter of the State of California do hereby certify:
 6        That the foregoing proceedings were taken before
 7   me at the time and place herein set forth; that any
 8   witnesses in the foregoing proceedings, prior to
 9   testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is an accurate
13   transcription thereof.
14        That before completion of the deposition, a
15   review of the transcript [ ] was [ ] was not requested.
16        I further certify that I am neither financially
17   interested in the action nor a relative or employee of
18   any attorney of any of the parties.
19        IN WITNESS WHEREOF, I have this date subscribed
20   my name this 5th day of February, 2020.
21
22
23        Dayna Michelle Glaysher
24        CSR Number 13079
25        RPR, CRR Number 28081
```

Page 60

**EXHIBIT 53**

This is a copy of your Report to the U.S. Consumer Product Safety Commission submitted on 8/23/2018

## Incident Details

| | |
|---|---|
| Document Number: | H1880089A |
| Report Number: | 20180823-73697-1786538 |
| Report Submitted Date: | 8/23/2018 |
| Who You Are: | Consumer |
| Incident Description: | (b)(6) |

No email address

Purchased 14" Portland Chainsaw model#61592 from Harbor Freight around August 2017
Incident occurred May 2018
The caller was cutting shrubs and was cutting lower areas so he was down on his knees but when he tried to lay the saw down while taking his finger off the switch but the saw kept running.
The saw cut his left forearm when it became entangled in the limb he was cutting.
The caller lost consciousness for a few minutes and when he regained it he worked to pull the limb out of the cut then went to his house where his wife and his son rushed him to the Mercy hospital in Springfield, Missouri emergency room where they examined the injury, x-rayed the arm then opened it and flushed it out.
There was a discussion whether to stitch the cut then doctors decided to close the wound and wrap the forearm in an attempt to avoid infection.
However the caller's doctor and the caller are still fighting infection after 3 months. He has also been taking antibiotics.
The caller has not yet been able to contact the manufacturer but he does intend to continue trying to contact them.
This product is recalled with release# 18-155

| | |
|---|---|
| Incident Date: | 5/15/2018 This is an estimate |
| Incident Location: | Home/Apartment/Condominium (b)(6) United States This is my home address |

## Victim Details

| | |
|---|---|
| First Name: | (b)(6) |
| Last Name: | |
| Injury Information: | Injury, Emergency Department Treatment Received |
| Victim is of Hispanic/Latino origin? | |
| Race: | Unspecified |
| Other Race/Ethnicity: | |
| My Relationship to Victim: | Self |
| Gender: | Male |
| Age when incident occurred: | (Unspecified) Years |
| Address: | (b)(6) |

**CPSC does not guarantee the accuracy, completeness, or adequacy of the contents of the Publicly Available Consumer Product Safety Information Database on SaferProducts.gov, particularly with respect to information submitted by people outside of CPSC.**

E-mail:
Phone Number: (b)(6)

---

## Product Details

| | |
|---|---|
| Product Description: | 14 inch Chainsaw |
| Product Category: | Home Maintenance and Structures |
| Product Type: | Tools & Hardware |
| Brand Name: | Portland |
| Manufacturer / Importer / Private Labeler Name: | Harbor Freight |
| Model Name or Number: | 61592 |
| Serial Number: | Not found |
| Date Manufactured: | |
| Manufacturer Date Code: | |
| Manufacturer Address: | Not specified |
| Manufacturer Website URL: | |
| Manufacturer Phone Number: | |
| Retailer: | Harbor Freight |
| Retailer State: | Missouri |

**Additional Details**

| | |
|---|---|
| Purchase Date: | 8/15/2017 This date is an estimate |
| I still have the product in my possession. | Yes |
| The product was damaged before the incident. | No |
| The product was modified before the incident. | No |
| Have you contacted the manufacturer? | No |
| If not, do you plan to contact them? | Yes |

---

**CPSC does not guarantee the accuracy, completeness, or adequacy of the contents of the Publicly Available Consumer Product Safety Information Database on SaferProducts.gov, particularly with respect to information submitted by people outside of CPSC.**

Explanation:

| Your Contact Information | |
|---|---|
| First Name: | (b)(6) |
| Last Name: | |
| Address: | |
| E-mail | |
| Phone Number: | |

OMB Control Number 3041-0146

**CPSC does not guarantee the accuracy, completeness, or adequacy of the contents of the Publicly Available Consumer Product Safety Information Database on SaferProducts.gov, particularly with respect to information submitted by people outside of CPSC.**

**EXHIBIT 54**

1  **BURSOR & FISHER, P.A.**
   L. Timothy Fisher (State Bar No. 191626)
2  Joel D. Smith (State Bar No. 244902)
   Blair E. Reed (State Bar No. 316791)
3  1990 North California Boulevard, Suite 940
   Walnut Creek, CA  94596
4  Telephone: (925) 300-4455
   Facsimile:  (925) 407-2700
5  E-Mail: ltfisher@bursor.com
           jsmith@bursor.com
6          breed@bursor.com

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  WILL KAUPELIS and FRANK ORTEGA,        Case No. 8:19-cv-1203
    individually and on behalf of all others similarly
12  situated,
                                           **PLAINTIFFS' FIRST SET OF**
13                          Plaintiffs,    **INTERROGATORIES**

14       v.

15  HARBOR FREIGHT TOOLS USA, INC.,

16                          Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

1

2        Pursuant to Federal Rules of Civil Procedure 33, Plaintiff requests that Defendant Harbor

3    Freight Tools, USA respond to the following Interrogatories within the time allowed by law.

4                                              **DEFINITIONS**

5        The following definitions and instructions are incorporated by reference whenever

6    applicable in this document:

7            1.        The terms "ADVERTISEMENTS" and "ADVERTISING" shall mean ANY

8    labeling, package inserts, web pages (including metatags used for the purpose of search engine

9    optimization or otherwise directing web traffic), radio or television broadcasts, telephone

10    marketing, point of sale or internet displays, infomercials, brochures, or magazine, newspaper or

11    ANY other print or electronic media.

12            2.        The term "CHALLENGED PRODUCTS" means the Portland, One Stop Gardens,

13    and Chicago Electric 14-inch Electric Chainsaws described in Exhibit A to the CUGINI

14    DECLARATION.

15            1.        The term "CLASS PERIOD" shall mean June 17, 2015, through May 1, 2018.

16            2.        The term "CUGINI DECLARATION" means the Declaration of Danielle R.

17    Cugini, filed in *Olmos v. Harbor Freight Tools USA, Inc.*, N.D. Cal. Case No. 3:18-cv-04986-SK

18    on October 1, 2018, Docket No. 14-1.

19            3.        The term "DEFENDANT," "YOU" or "YOUR" shall mean Harbor Freight Tools

20    U.S.A., Inc., including any person or entity acting on its behalf, such as, but not limited to, agents,

21    employees, or other representatives.

22            4.        The terms "IRI DATA" and "NIELSEN DATA" shall mean Information Resources,

23    Inc. ("IRI"), the Nielsen Company, or any other data reporting service from which similar types of

24    sales data and/or consumer research is available.

25            5.        The term "SKU," or stock keeping unit, shall be construed to mean the product

26    identification code or unique identifier that distinguishes a product from other items for the

27    purposes of stock keeping and inventory tracking, such as a UNIVERSAL PRODUCT CODE

28    ("UPC").

6.      The term "UNIVERSAL PRODUCT CODE" or "UPC" means a unique barcode and number obtained by the product manufacturer from the Global Standards Organization that is printed on retail product packaging used to scan products at the point of sale.

## INTERROGATORIES

1.      State YOUR **net** revenue from the sale of CHALLENGED PRODUCTS in the United States during the CLASS PERIOD.  If YOU rely on Rule 33(d) in responding to an Interrogatory, you must produce documents with YOUR written responses to these interrogatories and identify in YOUR written responses the specific Bates Number(s) and any other information necessary for Plaintiff to locate the responsive information as easily as YOU could.  *E.g.*, *GCIU-Employer Ret. Fund v. Quad/Graphics*, 2017 WL 10399497, at *2 (C.D. Cal. Feb. 9, 2017) (ordering defendant who relied on Rule 33(d) to provide written responses that "adequately specify the documents (and, as necessary, the basic methodology for using those documents)" so that plaintiff could locate responsive information); *Rainbow Pioneer No. 44-18-04A v. Hawaii-Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983) (Rule 33(d) "was amended in 1980 to prevent abuse of the business record option" by requiring written responses to "specify where in the records the answers could be found.").

2.      State YOUR **net** revenue from the sale of CHALLENGED PRODUCTS in California during the CLASS PERIOD.  If YOU rely on Rule 33(d) in responding to an Interrogatory, you must produce documents with YOUR written responses to these interrogatories and identify in YOUR written responses the specific Bates Number(s) and any other information necessary for Plaintiff to locate the responsive information as easily as YOU could.

3.      State the number of units of CHALLENGED PRODUCTS sold to consumers in the United States during the CLASS PERIOD.  If YOU rely on Rule 33(d) in responding to an Interrogatory, you must produce documents with YOUR written responses to these interrogatories and identify in YOUR written responses the specific Bates Number(s) and any other information necessary for Plaintiff to locate the responsive information as easily as YOU could.

4.      State the number of units of CHALLENGED PRODUCTS sold to consumers in California during the CLASS PERIOD.  If YOU rely on Rule 33(d) in responding to an

Interrogatory, you must produce documents with YOUR written responses to these interrogatories and identify in YOUR written responses the specific Bates Number(s) and any other information necessary for Plaintiff to locate the responsive information as easily as YOU could.

5.      State the total number of people in the United States who received a replacement unit in connection with the recall program described in Paragraph 4 of the CUGINI DECLARATION.  If YOU rely on Rule 33(d) in responding to an Interrogatory, you must produce documents with YOUR written responses to these interrogatories and identify in YOUR written responses the specific Bates Number(s) and any other information necessary for Plaintiff to locate the responsive information as easily as YOU could.

6.      State the total number of people in California who received a replacement unit in connection with the recall program described in Paragraph 4 of the CUGINI DECLARATION.  If YOU rely on Rule 33(d) in responding to an Interrogatory, you must produce documents with YOUR written responses to these interrogatories and identify in YOUR written responses the specific Bates Number(s) and any other information necessary for Plaintiff to locate the responsive information as easily as YOU could.

7.      State the total number and value of gift cards that were given in connection with the recall program, as described in Paragraph 8 of the CUGINI DECLARATION.  If YOU rely on Rule 33(d) in responding to an Interrogatory, you must produce documents with YOUR written responses to these interrogatories and identify in YOUR written responses the specific Bates Number(s) and any other information necessary for Plaintiff to locate the responsive information as easily as YOU could.

8.      Among the gift cards described in Paragraph 8 of the CUGINI DECLARATION, state the total number and value of gift cards that have been redeemed to date.  If YOU rely on Rule 33(d) in responding to an Interrogatory, you must produce documents with YOUR written responses to these interrogatories and identify in YOUR written responses the specific Bates Number(s) and any other information necessary for Plaintiff to locate the responsive information as easily as YOU could.

9.      State the total number of customers who received "cash refunds or separate product

exchanges" in lieu of a gift card, as described in Paragraph 8 of the CUGINI DECLARATION.  If YOU rely on Rule 33(d) in responding to an Interrogatory, you must produce documents with YOUR written responses to these interrogatories and identify in YOUR written responses the specific Bates Number(s) and any other information necessary for Plaintiff to locate the responsive information as easily as YOU could.

10.    Identify, by company name, address and (if applicable) website, all third parties responsible for the design or printing of the packaging of the CHALLENGED PRODUCTS during the CLASS PERIOD.

11.    Identify by name and part number, all component parts that YOU determined were a cause or potential cause for the "safety hazard" associated with the CHALLENGED PRODUCTS, as described in Paragraph 2 of the CUGINI DECLARATION.

Dated:  August 7, 2019                                Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:_____/s/ Joel D. Smith_____
                     Joel D. Smith

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
          jsmith@bursor.com
          breed@bursor.com

*Counsel for Plaintiffs*

**EXHIBIT 55**

CERTIFIED COPY

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   SOUTHERN DIVISION

4

5    WILL KAUPELIS AND FRANK      )
     ORTEGA, INDIVIDUALLY AND     )
6    ON BEHALF OF ALL OTHERS      )
     SIMILARLY SITUATED           )
7                                 )
              Plaintiffs,         )
8                                 )
              vs.                 ) Case No.
9                                 ) 8:19-cv-01203-JVS-DFM
     HARBOR FREIGHT TOOLS USA,    )
10   INC.                         )
                                  )
11            Defendant.          )
                                  )

12

13

14

15

16         (CONTAINS CONFIDENTIAL MATERIAL)

17       Videotaped deposition of FRANK ORTEGA,

18    taken on behalf of Defendant, at 2029

19    Century Park East, Suite 3100, Los Angeles,

20    California, 90067, commencing at 9:06 A.M.,

21    Tuesday, November 5, 2019, before Kyoko

22    Jacobson, Certified Shorthand Reporter,

23    Certificate No. 6920.

24

25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose          (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez           (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills     (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn          (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris           00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

2

1       Q    And did you take it out of the box?

2       A    Prior to using it?

3       Q    When you -- no.  When you first got home.

4       A    No.  Because I had to do other stuff around

09:54  5  the house.

6       Q    So -- so my next question is then between

7  the time you bought it, when was the -- how long of a

8  time elapsed between the time that you used it?

9       A    Probably between two to three days.

09:55  10      Q    Okay.  And so now we are at the two- to

11  three-day period.  Did you take it out of the box?

12      A    After the third day, yes.

13      Q    All right.  And did you read the owner's

14  manual?

09:55  15      A    I assume so, yes.

16      Q    When you say you assume so, is that your

17  normal practice to review owner's manuals on products

18  that you buy before you use them?

19      A    Yes.

09:55  20      Q    And in the owner's manual did you -- do you

21  recall anything that surprised you when you read the

22  owner's manual?

23      A    No.

24      Q    So what did you do with the box after you --

09:55  25  oh, by the way, describe for me what the box looked

52

FRANK ORTEGA

BARKLEY
Court Reporters

1    like.

2        A    In what detail?  Square box with the item

3    inside, paper, cellophane.  That's it.

4        Q    And how long was the box?

09:55  5        A    I would say between 2 to 3 feet --

6        Q    Okay.

7        A    -- by another foot, foot and a half.

8        Q    And was it -- was it a rectangle or was the

9    box different dimensions?

09:56 10        A    I believe it was a rectangle.

11        Q    And do you recall any of the writings on the

12    package, the outside package?

13        A    Besides the name of the chain saw on the

14    box, no.

09:56 15        Q    And was there anything that you saw on that

16    packaging that you said, "Oh, this is why I'm going

17    to buy this because of what it says on the -- on the

18    box"?

19        A    No.

09:56 20        Q    So you opened it up.  What did you do with

21    the packaging?

22        A    Put it in the recycle bin when I was done

23    taking out the chain saw.

24        Q    Okay.  Did you -- did you do -- did you also

09:56 25    throw away the receipt you got from the store?

53

FRANK ORTEGA

BARKLEY
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2    STATE OF CALIFORNIA   )
                            ) ss.
 3    COUNTY OF LOS ANGELES )

 4

 5

 6         I, Kyoko Jacobson, hereby certify:

 7         I am a duly qualified Certified Shorthand

 8    Reporter in the State of California, holder of

 9    Certificate Number CSR 6970 issued by the Certified Court

10    Reporters' Board of California and which is in full

11    force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12         I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a)(a)).

17         I am not a relative or employee or attorney or

18    counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22         I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25                        / / /
```

107

FRANK ORTEGA

BARKLEY
Court Reporters

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3          Before completion of the deposition, review of

4   the transcript [xx] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: December 3, 2019

10

11

12

13

14

15   _____

16

17

18

19

20

21

22

23

24

25

108

BARKLEY
Court Reporters

**EXHIBIT 56**

**CERTIFIED COPY**



1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   SOUTHERN DIVISION

4                     ---o0o---

5

6

7

        WILL KAUPELIS AND FRANK ORTEGA,    )
8       individually and on behalf of      )
        all others similarly situated,     )
9                                          )
                          Plaintiffs,      )   Case No.
10                                         )   8:19-CV-1203-
                  vs.                      )   JVS-DFM
11                                         )
        HARBOR FREIGHT TOOLS USA, INC.,    )
12                                         )
                          Defendant.       )
13                                         )

14

15

16                     ---o0o---

17          THURSDAY, MAY 28, 2020

18

19      ZOOM VIDEO DEPOSITION OF COLIN B. WEIR

20                     ---o0o---

21

22

23

24   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
        464214

**BARKLEY**
*Court Reporters*
barkley.com
25

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose          (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez          (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn          (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

BARKLEY COURT REPORTERS

     1          A.   It was some time after I signed my report.

     2          Q.   Why didn't you amend your report to

     3     identify other documents that you reviewed?

     4          A.   The precise nature of the recall has no

10:51  5     bearing on my calculation of economic damages, so I

     6     didn't believe that it warranted some sort of

     7     additional amendment or supplement to my report.

     8               I am controlling for the people that do

     9     avail themselves of the recall as part of my

10:51 10     damages calculus.  I think that would be relevant.

    11     But otherwise the precise nature of the recall or

    12     who initiated it doesn't really change the damages

    13     calculus on a class-wide basis in any way.

    14          Q.   You just opined that the recall may have

10:51 15     met minimum requirements.  My request to you is:

    16     Other than reviewing Ms. Suchini's declaration, do

    17     you have any other basis for that statement?

    18          A.   It might have come up in conversations

    19     with counsel.

10:52 20          Q.   Other than counsel, do you have any other

    21     basis for that statement?

    22          A.   Not that I can think of as I sit here

    23     today, but I may have seen something else along the

    24     way.

10:52 25          Q.   Well, when you say you may have seen

                    BARKLEY COURT REPORTERS


                              19

BARKLEY
Court Reporters

```
        1    or you are sitting across the table from me?

        2        A.   Correct.  We use one flat rate for all the

        3    work in the case.

        4        Q.   Okay.  I apologize.  I should have asked

12:09   5    you this before.  If you can go back to your

        6    report.  And it starts on the -- Paragraph 44.  It

        7    starts on Page 10.

        8        A.   Okay.  I'm with you there.

        9        Q.   You have various tables that you described

12:09  10    that are entitled "Unit Sales" and "Dollar Sales."

       11    Could you tell me the methodology that you used to

       12    develop these tables?

       13        A.   I'll give you the high level, and if you

       14    want to drill down, feel free.

12:10  15            But largely I took defendant's regular

       16    sales data on a state-by-state basis and analyzed

       17    for -- each of these tables represents a different

       18    proposed class, analyzed the range of dates for

       19    each state that were applicable for that class, as

12:10  20    I was informed by counsel, and I took gross retail

       21    sales minus returns in order to get net sales.  I

       22    added to that online sales on a net basis and

       23    subtracted from that amounts paid out as part of

       24    the recall.

12:10  25            So this is basically net, net, net sales,
```

COLIN B. WEIR

BARKLEY
Court Reporters

1    both in units and dollars.

2        Q.   As it relates to the Internet sales, were

3    you able -- how did -- were you able to earmark

4    Internet sales in California by looking at the

12:11  5  documents that you received?

6        A.   My recollection is yes.

7        Q.   Okay.  So you didn't have to do anything

8    beyond evaluating the materials that were sent to

9    you?  You didn't have to go out to try to contract

12:11 10  with Nielsen or somebody like that to figure out

11   what the Internet sales were per state?

12       A.   Again, my best recollection is that the

13   data from defendant did specify its sales both

14   retail and online on a state-by-state basis, not

12:11 15  per se in a manner that aligned with the class

16   definitions.  So there was work there to match up

17   states to the class definitions and then match up

18   the different dates for each relevant state for

19   each proposed class or subclass.

12:11 20       Q.   Okay.  Any other methodologies that we

21   haven't discussed that you did in order to come up

22   with these numbers?

23       A.   In terms of totaling the sales, that's a

24   high-level approach that I took.  There's all of

12:12 25  the information behind the conjoint work that will

BARKLEY COURT REPORTERS

67

COLIN B. WEIR

```
1              DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA    )
                            ) ss.
3    COUNTY OF SAN FRANCISCO )

4

5

6          I, BALINDA DUNLAP, hereby certify:

7          I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR 10710 issued by the Certified Court

10   Reporters' Board of California and which is in full

11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12         I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a)(a)).

17         I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22         I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                        / / /
                 BARKLEY COURT REPORTERS
```

75

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3          Before completion of the deposition, review of

4  the transcript [XX] was [   ] was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated: 06/08/20

10

11  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BARKLEY COURT REPORTERS

76

COLIN B. WEIR

**EXHIBIT 57**

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   WILL KAUPELIS and FRANK ORTEGA, ) Case No.: 8:19-cv-
    individually and on behalf of  ) 012203-JVS-DFM
5   all others similarly situated,  )
                                     )
6                 Plaintiffs,        )
                                     )
7          vs.                       )
                                     )
8   HARBOR FREIGHT TOOLS USA,        )
    INC.,                            )
9                                    )
                  Defendant.         )
10  _____ )

11

12

13

14      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

15                 JOSEPH MOHOROVIC

16                 Aurora, Illinois

17            Friday, August 14, 2020

18

19

20

21   Reported by:

22   JANA J. BOMMARITO

23   CSR No. 10880

24   Job No. 4207173

25

                                            Page 1

1    general?

2        A    I would say in general, yes.

3        Q    Did you do anything to determine whether

4    Harbor Freight's efforts to publicize the chainsaw

5    recall were comparable to what a class action                11:04

6    administrator could do to notify customers about the

7    recall?

8        A    I did evaluate the activities of Harbor

9    Freight Tools with regards to the CPSC recall, both

10   their -- their activities, as well as the results of    11:04

11   those activities, but I would be unable to provide a

12   fair comparison without knowing fully what the --

13   the roles and the contributions of what a class

14   action administrator might do, require, or

15   deliver.                                                 11:05

16       Q    And you didn't conduct that analysis that

17   you just described?

18       A    No, I did not.

19       Q    Would paying for an advertisement on

20   Facebook be a reasonable measure to notify customers    11:05

21   about a recall?

22       A    The use of social media in recalls was a

23   part of this case.  To the best of my recollection,

24   you mentioned specifically Mr. Smith paying for

25   advertisements on Facebook.  And whether or not that    11:05

Page 52

```
 1        THE VIDEOGRAPHER:  Off the record.  The time is

 2   11:27 a.m.

 3             (Brief recess taken.)

 4        THE VIDEOGRAPHER:  Back on the record.  The

 5   time is 11:43 a.m.                              11:43

 6   BY MR. SMITH:

 7        Q    In -- at various places in your report,

 8   which I believe has been marked Exhibit 95, you

 9   discuss different types of correction rates.

10             Does that ring a bell for you?          11:43

11        A    It does.

12        Q    Okay.  And one type of correction rate you

13   describe is called an overall correction rate; is

14   that correct?

15        A    That is correct.                        11:43

16        Q    What does overall correction rate mean?

17        A    In using the -- the jargon of the CPSC --

18   and a more thorough deck in support of this is

19   provided in my materials reviewed should you want to

20   take a closer look and investigate it.            11:43

21             The CPSC looks at it along -- looks at

22   recall return rates along -- along multiple lines;

23   at the manufacturer, the retailer, the distributor,

24   and at the consumer level.

25        Q    Okay.  And overall correction rate        11:44
```

Page 69

```
 1    encompasses all of those categories that you just

 2    described?

 3         A    Thank you.  Yes, it does.

 4         Q    Okay.  And is one subcategory -- I think

 5    you mentioned the retail level correction rate.         11:44

 6              Did I hear that correctly?

 7         A    That is correct.

 8         Q    What does retail level correction rate

 9    mean?

10         A    That would be the product that is in       11:44

11    possession of the retailer.  And when they -- when a

12    firm conducting a recall does its monthly progress

13    report, it has to enumerate corrections by all of

14    those individual levels.  So if I were advising a

15    firm how to fill out their entry -- let me just be     11:45

16    more specific with this case.

17              If a retailer is -- if this is a -- a

18    priv- -- a private branded item where the retailer

19    is in the capacity of the manufacturer as well as

20    the retailer, they might put it in either one of      11:45

21    those two buckets in terms of corrective product

22    subject to the recall.

23         Q    Does the term "consumer level correction

24    rate" mean anything?

25         A    Yes, it does.                               11:45
```

Page 70

1        Q     What does it mean?

2        A     That means that the product that was

3    delivered to consumers that was remedied.

4        Q     Is that a -- another way of saying -- is

5    consumer level correction another way of saying a          11:46

6    return of the product?

7        A     I noticed that -- the use of the word

8    "return" in the Complaint, and I don't find that

9    inaccurate.  I just believe in my -- my experience,

10   my expertise at the CPSC to be not a complete            11:46

11   picture of the correction rate.

12           But I wouldn't disagree that -- to call --

13   while it's not a term that's used in the CPSC or I

14   said the product safety community generally

15   speaking, if you were to return -- refer to the          11:46

16   product that was distributed to consumers subject to

17   the corrective action and remedied, to call that a

18   return rate because return would -- would seem to

19   mean product that got out and came back, I don't

20   think that would be inaccurate to substitute that        11:46

21   terminology.

22       Q     Okay.  The consumer level correction rate

23   does not equal the percentage of people who may have

24   received refunds; is that correct?

25       A     It would include -- it -- it would include    11:47

Page 71

```
 1   both.

 2       Q    Okay.  Both what?

 3       A    So if you're saying would the return rate

 4   also include those who availed themselves of the

 5   remedy but didn't actually return the product, I        11:47

 6   would say -- or if I was asked in support of a

 7   client how should we count this, perhaps the

 8   consumer said, "Well, I know I'm supposed to return

 9   the product to -- to be able to get the remedy.  I

10   don't have it.  I threw it away," the file in this      11:47

11   matter does contain circumstances where consumers

12   were able to produce other evidence of their

13   purchase and then they were provided either the

14   replacement saw, in some -- in some cases they were

15   provided a refund, then I would advise that that        11:48

16   would be still counted towards the rem- -- the

17   remedies associated at the consumer level.

18       Q    Does -- let me -- let me try asking the

19   question a different way because I don't --

20       A    Okay.                                          11:48

21       Q    I'm not sure that quite got it.

22            The -- you have a certain consumer

23   correction rate.  Let me -- strike that.

24            Is there a -- have you determined what the

25   consumer level correction rate was in this case?       11:48
```

Page 72

```
1          A     I believe it's in my report.

2          Q     Okay.  I'll direct your attention to

3    Exhibit 95, Page 25, Footnote 61.  And near the

4    bottom of that footnote, there's a reference to a

5    consumer level correction rate of 6.6 percent.          11:49

6                Do you see that?

7          A     I do.  Thank you.

8          Q     Is that your understanding of what the

9    consumer level correction rate was in this

10   particular case?                                         11:49

11         A     Yes, it is.

12         Q     Okay.  That 6.6 percent includes some

13   people who may have refeed -- received refunds; is

14   that correct?

15         A     That's my understanding.                     11:49

16         Q     Okay.  But you're not saying that 6.6

17   percent of the people who fall within the category

18   of consumer level correction rate all received

19   refunds.

20               Do I understand that correctly?             11:49

21         A     That's correct.

22         Q     Okay.  So some percentage smaller than 6.6

23   percent reflects the number of people who may have

24   received a refund in connection with the recall; is

25   that correct?                                            11:50
```

Page 73

1        A    It is correct.  And I would even go

2   further to describe that the remedy that was -- that

3   was recommended by the CPSC in part of the

4   Corrective Action Plan was a replacement, so I would

5   expect that that percentage to be small.  However, I    11:50

6   don't recall seeing a breakdown of that in the

7   file.

8        Q    Do you know how many Harbor Freight

9   customers returned their chainsaws in connection

10  with the recall?                                        11:50

11       A    I would -- no, I do not.  I would say that

12  this is a percentage of what I recognize in the file

13  as 62,971 consumers who have availed themselves of

14  the Corrective Action Plan and it would be a

15  percentage of those consumers.                          11:50

16       Q    Okay.  And do you know how many people --

17  how many Harbor Freight customers got a refund in

18  connection with the recall?

19       A    No, I do not.

20       Q    Bear with me a moment.  I'm just marking      11:51

21  another exhibit.

22            Okay.  You should have available to you

23  now Exhibit 96.

24            (Whereupon Exhibit 96 was marked for

25  identification, a copy of which is attached hereto.)    11:52

Page 74

```
 1                    CERTIFICATION OF

 2              CERTIFIED SHORTHAND REPORTER

 3

 4          I, the undersigned, a Certified Shorthand

 5   Reporter of the State of California do hereby

 6   certify:

 7          That the foregoing proceedings were taken

 8   before me at the time and place herein set forth;

 9   that any witnesses in the foregoing proceedings,

10   prior to testifying, were placed under oath; that a

11   verbatim record of the proceedings was made by me

12   using machine shorthand, which was thereafter

13   transcribed under my direction; further, that the

14   foregoing is an accurate transcription thereof.

15          That upon completion, a review of the

16   transcript was [X] was not [ ] requested.

17          I further certify that I am neither

18   financially interested in the action nor a relative

19   or employee of any attorney of any of the parties.

20          IN WITNESS WHEREOF, I have this date

21   subscribed my name this 24th day of August, 2020.

22

23

24          Jana Bommarito,

25          CSR No. 10880

                                        Page 211
```

**EXHIBIT 58**

```
 1            UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4  WILL KAUPELIS and FRANK      )

 5  ORTEGA, individually and     )

 6  on behalf of all others      )

 7  similarly situated,          )

 8            Plaintiffs,        )

 9      vs.                      ) Case No. 8:19-cv-01203-

10  HARBOR FREIGHT TOOLS USA,    )        JVS-DFM

11  INC.,                        )

12            Defendant.         )

13  _____   )

14

15        VIDEOTAPED DEPOSITION OF DANIELLE CUGINI

16              Van Nuys, California

17            Wednesday, January 29, 2020

18

19  REPORTED BY:

20  Dayna Michelle Glaysher

21  CSR No. 13079

22  RPR, CRR No. 28081

23  JOB No. 3837294

24

25  PAGES 1 - 129
```

Page 1

1     Q.   Is there any reason why Harbor Freight didn't

2   just issue them a refund since it knew they bought the

3   product and they knew how to contact them?

4     A.   So the important thing in a recall, particularly

5   one pertaining to a safety hazard, is that you actually          11:36:05

6   get the product back.  And so in order to do that you

7   need the customer to return the product.  And there's no

8   incentive for them to return the product if you just

9   blanketly issue them the refund first.

10     Q.   Was there any other reason for the decision not          11:36:22

11   to issue automatic refunds?

12     A.   The CPSC would not have allowed it.

13     Q.   Is there a document that you have received from

14   the CPSC that states that the CPSC would not have

15   allowed it?                                                      11:36:39

16     A.   No.

17     Q.   Can you tell me approximately when in 2019 the

18   emails were sent out?

19     A.   I believe it was middle of June.

20     Q.   So do you have in front of you a document that's         11:37:02

21   been marked Exhibit 29, with the Bates numbers on the

22   first page ending in the numbers 180?

23        (Whereupon, Deposition Exhibit 29 was marked for

24   identification by the Certified Shorthand Reporter, a

25   copy of which is attached hereto.)                              11:38:20

Page 97

```
1    the stores still did not have replacements on stock?

2        A.  That sounds accurate.

3        Q.  Did Harbor Freight receive complaints from

4    customers about lack of replacement units?

5        A.  Yes.                                        11:52:00

6        Q.  Was anyone at Harbor Freight tasked with

7    monitoring complaints either on Twitter or Facebook or

8    anywhere about the inability to get replacement

9    products?

10       A.  The customer service team was instructed on how   11:52:12

11   to discuss the situation with customers calling to

12   complain them -- complain to them.  I don't know that

13   the social media -- social media was the corporate

14   communications director.  And I don't know that she

15   addressed anything directly on social media.          11:52:36

16       Q.  Is it consistent with your recollection that as

17   of June -- late June, maybe June 22nd Harbor Freight was

18   still having trouble getting replacement products in its

19   stores?

20       A.  Yes, that's accurate.                        11:52:57

21       Q.  Do you know if customers complained to the CPSC

22   about the unavailability of replacement products?

23       A.  Yes, they did.

24       Q.  Did you ever have a conversation with anyone at

25   the CPSC about that subject?                          11:53:17
```

Page 106

1     A.  After the recall was launched, no.  Outside

2  counsel would have.

3     Q.  Did you have a conversation about that subject

4  before the recall was launched?

5     A.  We advised the CPSC we would not have full stock          11:53:35

6  as of the launch date during our discussions about how

7  to best publicize the recall and explain the methods for

8  customers.

9     Q.  What -- what was the CPSC's reaction to that?

10     A.  The CPSC asked us what our alternative was.  And          11:53:52

11  we said we would give customers a gift card when they

12  returned the chainsaw in place of the replacement

13  product.

14     Q.  Are you aware of any emails exchanged between

15  yourself or anyone at Harbor Freight and the CPSC          11:54:11

16  discussing that option?

17     A.  I believe mostly it was by phone.  I don't recall

18  if there were emails or not.

19     Q.  And were those conversations by phone between you

20  and someone at the CPSC?          11:54:28

21     A.  It would've been myself and Sheela Kadambi at the

22  CPSC.

23     Q.  And did you have discussions with Ms. Kadambi

24  about publication methods?

25     A.  Yes.          11:54:43

Page 107

```
 1    the executives like Jason Sprong, the head of

 2    merchandising who's no longer there.  So it's now

 3    Sam Weinberg.  But he wouldn't have actually been in

 4    that meeting.

 5         And it would've been a joint discussion about how    12:04:32

 6    to handle.  Because we knew we were not going to have

 7    enough chainsaws to supply the demand immediately, and

 8    we wanted to encourage some sort of participation.

 9       Q.  Do Harbor Freight gift cards have expiration

10    dates?                                                    12:05:08

11       A.  No.

12       Q.  I think looking back at Exhibit 22, which is your

13    declaration, you noted that refunds -- I'm looking at

14    paragraph 8.  Refunds were only given in limited

15    circumstances.                                            12:05:36

16         Do you see that?

17         It's page 2, line 14 of your declaration,

18    Exhibit 22.

19       A.  That's cash refunds.

20       Q.  Yes.                                               12:05:42

21       A.  Yes.

22       Q.  Why is it that Harbor Freight only gave cash

23    refunds in limited circumstances?

24       A.  The agreement in the policy was to give the

25    replacement chainsaw.  If you didn't have the            12:05:55
```

Page 114

```
 1    replacement chainsaw, give them a gift card of that

 2    value.

 3       Q.  So --

 4       A.  Typically --

 5       Q.  Oh, I'm sorry.  Go ahead.                    12:06:01

 6       A.  -- for returns you only get your original method

 7    of payment or cash if you have the receipt.  We were not

 8    requiring you to have the receipt.  So we were giving

 9    you just a gift card at a set value.  Our chainsaw

10    could've been on sale when you bought it.            12:06:17

11        We set the average selling price.  So we opted to

12    do a gift card because we were not making you prove you

13    paid X amount and deserved this amount in cash.

14       Q.  So it was essentially a policy decision to make

15    it more or less consistent with your regular return    12:06:32

16    policy?

17       A.  Correct.

18       Q.  Is it consistent with your memory that

19    approximately a thousand gift cards worth approximately

20    $50,000 were distributed in connection with the recall?  12:06:58

21        And if you don't remember, that's fine.

22       A.  I really don't remember.

23       Q.  Okay.  Do you know how many of the gift cards

24    that were given out, whatever number that may be, were

25    actually redeemed?                                   12:07:30
```

Page 115

```
 1              Certification of Court Reporter
 2                      Federal Jurat

 3

 4         I, the undersigned, a Certified Shorthand
 5    Reporter of the State of California do hereby certify:
 6         That the foregoing proceedings were taken before
 7    me at the time and place herein set forth; that any
 8    witnesses in the foregoing proceedings, prior to
 9    testifying, were placed under oath; that a verbatim
10    record of the proceedings was made by me using machine
11    shorthand which was thereafter transcribed under my
12    direction; further, that the foregoing is an accurate
13    transcription thereof.
14         That before completion of the deposition, a
15    review of the transcript [ ] was [ ] was not requested.
16         I further certify that I am neither financially
17    interested in the action nor a relative or employee of
18    any attorney of any of the parties.
19         IN WITNESS WHEREOF, I have this date subscribed
20    my name this 5th day of February, 2020.

21

22

23    Dayna Michelle Glaysher
24    CSR Number 13079
25    RPR, CRR Number 28081
```

Page 129

**EXHIBIT 59**

# BURSOR & FISHER
#### P.A.

**1990 N. CALIFORNIA BLVD.**
**SUITE 940**
**WALNUT CREEK, CA 94596**
**www.bursor.com**

**JOEL D. SMITH**
Tel: **925.300.4455**
Fax: **925.407.2700**
**jsmith@bursor.com**

May 7, 2019

***Via Certified Mail - Return Receipt Requested***

Harbor Freight Tools USA, Inc.
26541 Agoura Rd.
Calabasas, CA 91302-2093

Re:     *Demand Letter Pursuant to California Civil Code § 1782; Violation of Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.; U.C.C. §§ 2-313, 2-314; all other applicable laws*

To Whom It May Concern:

        This letter serves as a preliminary notice and demand for corrective action by Harbor Freight Tools, Inc. ("You" or "Defendant") pursuant to numerous provisions of California law, including but not limited to subsections (a)(5), (7), and (9) of the Consumers Legal Remedies Act, Civil Code § 1770, on behalf of our clients, Will Kaupelis, Frank Ortega, and all other similarly situated purchasers.  This letter also serves as notice pursuant to U.C.C. § 2-607(3)(A) concerning the breaches of express and implied warranties described herein.

        You have participated in the marketing and sale of Portland, One Stop Gardens, and Chicago Electric 14-inch Electric Chainsaws (the "Products").  However, you issued a recall of the Products due to a malfunction with the Products' power switch, which allows the chainsaw to continue operating even after the operator has switched the Product to the "off" position.  This defect poses a serious injury hazard to the operator.  The recall provided relief only to approximately 2% of individuals who purchased the defective products.

        Mr. Kaupelis and Mr. Ortega intend to seek action on behalf of a class defined as all persons in the United States who purchased the Products.  Mr. Kaupelis and Mr. Ortega also intend to seek action on behalf of a subclass of persons who purchased the Products in the State of California.

        To cure these defects, we hereby demand that You immediately make full restitution to all purchasers of the Products of all purchase money obtained from sales thereof.  If you do not, we will commence a putative class action seeking monetary relief under the CLRA on behalf of Mr. Kaupelis and Mr. Ortega, and all others similarly situated.

        We also demand that You promptly take all reasonable steps to preserve all documents, data, and information, including without limitation, all "Writings," as defined in California Evidence Code § 250 (collectively, "Documents"), and all "Electronically Stored Information,"

BURSOR&FISHER
P.A.

as defined in California Code of Civil Procedure § 2016.020(e), which refer or relate to any of the above-described practices, including, but not limited to, the following:

1.      All documents concerning the design, development, and/or testing of the Products;

2.      All documents concerning the advertisement, marketing, or sale of the Products;

3.      All documents concerning communications with purchasers of the Products;

4.      All documents concerning the total revenue derived from sales of the Products in California and the United States;

5.      All documents concerning the identity of individual purchasers of the Product.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter.

Please contact me right away if you wish to discuss an appropriate way to remedy this matter.  If I do not hear from you promptly, I will take that as an indication that you are not interested in doing so.

Very truly yours,

Joel D. Smith

**EXHIBIT 60**

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  SOUTHERN DIVISION

 4

       _____
 5    WILL KAUPELIS and FRANK       )

 6    ORTEGA, individually and on   )

 7    behalf of all others          )

 8    similarly situated,           )

 9            Plaintiffs,           )

         vs.                        ) Case No.

10    HARBOR FREIGHT TOOLS USA,     ) 8:19-cv-01203-JVS-DFM

11    INC.,                         )

12            Defendant.            )
       _____)

13

14

15         REMOTE VIDEOTAPED DEPOSITION OF

16            JONATHAN T. TOMLIN, Ph.D.

17             Los Angeles, California

18            Wednesday, August 5, 2020

19                   Volume I

20    Reported by:

21    CHRIS TE SELLE

22    CSR No. 10836

23    Job No. 4206660

24

25    PAGES 1 - 83

                                          Page 1
```

```
 1       A.    It was about an hour.                    09:07:22

 2       Q.    Dr. Tomlin, can you hear me okay, by the

 3   way?

 4       A.    Yes.

 5       MS. OZERAN:   Better.                           09:07:35

 6       MR. LESLIE:   Better?

 7       MS. OZERAN:   Yeah.

 8   BY MR. LESLIE:

 9       Q.    Dr. Tomlin, do you agree that the market

10   value for a good or service is measured by its      09:07:44

11   market price?

12       A.    I think it depends on the context, so,

13   there might be some legal context in which there's

14   some definition of market value.  I can tell you, as

15   an economist, I do think of market value and market  09:08:02

16   price as the same thing.

17       Q.    Did consumers receive any market value

18   from the chainsaws at issue in this litigation?

19       MS. OZERAN:   Objection.  Outside the scope.

20   BY MR. LESLIE:                                       09:08:22

21       Q.    You may answer.

22       A.    Sure.  They obtained value, meaning it had

23   value to them.  Whether they obtained value that

24   could equate into a market price, I don't know.  I

25   haven't analyzed that.                               09:08:39
```

Page 9

```
1              Can a defect in a consumer product ever      09:12:51

2    result in the market price of that product being

3    lower than it otherwise would have been but for the

4    defect?

5         MS. OZERAN:  Objection.  Incomplete             09:13:03

6    hypothetical.

7         THE WITNESS:  Right, it, the answer is, it

8    could.  It may or it may not, but, if you're asking

9    is it possible, yes, it's possible.

10   BY MR. LESLIE:                                        09:13:21

11        Q.   Everything else being equal, would you

12   agree that consumers are better off paying less

13   money rather than more money for a product?

14        A.   Yes, I would agree.

15        Q.   Are there methods that can be used to       09:13:48

16   determine class-wide damages for a consumer product

17   sold at retail?

18        A.   It depends on the, on the case.  So, there

19   could some cases in which there isn't a viable

20   method, and there can be cases in which there is a   09:14:10

21   viable method.  It depends on specifics.

22        Q.   What about a product, rather, let's say

23   it's an automobile, and let's say that there is a,

24   that it has a defective engine, which results in the

25   consumer not being able to drive the car as          09:14:36
```

Page 13

```
 1    BY MR. LESLIE:                                      09:51:54

 2         Q.   So, then, there would be a change,

 3    correct, because, obviously, the chainsaws do have a

 4    market price?

 5         A.   No, there wouldn't be any change, because  09:52:07

 6    it would be nonexistent.  There would be no market

 7    price.

 8         Q.   Have you ever seen a product defect, a

 9    disclosure of a product defect result in a change of

10    that product's price?                               09:52:29

11         A.   I can't recall of any instances, but this

12    is not something that I've studied.

13         Q.   Have you performed any analysis to

14    determine if any consumers would not have purchased

15    the challenged chainsaws if a disclosure had been   09:52:54

16    made, holding all else equal?

17         A.   Well, yes, in the sense that my opinion is

18    that if the disclosure described by Mr. Gaskin was

19    made at the time of purchase, it would be unlikely

20    that there would be any market price.  Therefore, it 09:53:22

21    would be unlikely that consumers would be purchasing

22    such a product.  There wouldn't be a market for it.

23         Q.   Have you performed any analysis to

24    determine how many fewer units of the challenged

25    chainsaws would have been sold if a disclosure      09:53:44
```

Page 30

```
 1   conducting it why they conducted it.              10:31:34

 2       Q.   Have you reviewed the complaint in this

 3   case?

 4       A.   Yes.

 5       Q.   Are you familiar with it?               10:32:06

 6       A.   I'm generally familiar with it.  I haven't

 7   reviewed the whole thing within the last couple of

 8   days, but I'm generally familiar with it, yes.

 9       Q.   In your own words, what is plaintiffs'

10   stated theory of liability?                     10:32:24

11       A.   Well, it's what I've described in my

12   declaration.  I can read it to you, if you'd like.

13       Q.   I would like not for you to read it from

14   your declaration, but, just sitting here, can you

15   tell me what it is.                             10:32:38

16       A.   Sure.  I mean, it's right here, but, if

17   you don't want me to use this, my understanding is

18   that the plaintiffs, at a high level, are arguing

19   that there was some issue with Portland chainsaws in

20   which under certain circumstances the chainsaw would 10:32:56

21   not shut off, and that this was not disclosed to

22   consumers in the packaging or the website.

23            That's at a high level.

24       Q.   Just going back to conjoint surveys for a

25   moment, do you have a general sense of some of the   10:33:20
```

Page 54

```
 1    reasons why businesses use conjoint surveys?          10:33:23

 2         A.   Yes.

 3         Q.   And what are they?

 4         A.   Well, they might have a new product

 5    introduction, and they want to know something about   10:33:40

 6    consumer demand for an attribute or a feature they

 7    are thinking about introducing.

 8         Q.   Can you think of any other reasons?

 9         A.   Well, usually, the reasons I'm thinking

10    about it, it has to do with trying to value a         10:34:01

11    particular product feature.  I can't think of

12    reasons beyond that.

13         Q.   So, earlier --

14         A.   By, value, I mean how consumers value it.

15         Q.   Understood.                                 10:34:23

16              So, we just talked about plaintiffs'

17    stated theory of liability, correct?

18         A.   Yes.

19         Q.   So, for the purposes of your work on this

20    case, have you assumed that plaintiff will establish  10:34:37

21    that liability?  Yes or no.

22         A.   No, I haven't made any assumption either

23    way.

24         Q.   Do you agree that a historic market price

25    reflects the then-extant demand conditions?          10:35:22
```

Page 55

| | | |
|---|---|---|
| 1 | seeing how well the data you do have predicts what | 11:09:33 |
| 2 | you held out. | |
| 3 | That's the way I think of it.  It may have | |
| 4 | some other, you know, usage in other places. | |
| 5 | Q.   Do you know what mean absolute error is? | 11:09:44 |
| 6 | A.   It's a statistical measure of seeing what | |
| 7 | the value of an error term is.  It's a way they're | |
| 8 | measuring performance, statistically. | |
| 9 | Q.   Is that how mean absolute error is used by | |
| 10 | conjoint practitioners? | 11:10:03 |
| 11 | A.   I think it would probably have to depend | |
| 12 | on the conjoint survey. | |
| 13 | Q.   Do conjoint analysis need to involve every | |
| 14 | attribute of the product being studied? | |
| 15 | A.   That's outside of my area of expertise.  I | 11:10:23 |
| 16 | don't design conjoint surveys, as I told you. | |
| 17 | Q.   So the answer is you don't know. | |
| 18 | A.   That answer is I don't have an opinion on | |
| 19 | that. | |
| 20 | Q.   Can conjoint be used to study products | 11:10:37 |
| 21 | that have not yet been introduced on the market? | |
| 22 | A.   Yes.  My understanding is conjoint is | |
| 23 | sometimes used to evaluate hypothetical products | |
| 24 | that haven't been introduced. | |
| 25 | Q.   What is orthogonal design within the | 11:10:55 |

Page 69

| | | |
|---|---|---|
| 1 | context of choice-based conjoint analysis? | 11:10:59 |
| 2 | A.   Generally, as I recall, it's a way of | |
| 3 | setting up the question levels in a certain way. | |
| 4 | You have a certain number of attributes that you | |
| 5 | want to set up.  Sometimes prices, though, is one of | 11:11:16 |
| 6 | those, and they give it in an table, and an | |
| 7 | orthogonal way is to set the questioning up. | |
| 8 | Q.   Is orthogonal design recommended for | |
| 9 | choice based conjoint analysis? | |
| 10 | A.   That, I don't know.  Once again, we're | 11:11:37 |
| 11 | getting into conjoint design, and I'm not an expert | |
| 12 | in designing conjoints, and I'm not designing one in | |
| 13 | this case. | |
| 14 | Q.   Can you study a product attribute in a | |
| 15 | conjoint survey without mentioning that attribute? | 11:11:52 |
| 16 | A.   I don't have an opinion on that one way or | |
| 17 | the other. | |
| 18 | Q.   So, you don't know? | |
| 19 | A.   Right.  I don't know the answer to that, | |
| 20 | as I sit here, because, I mean, we've been through | 11:12:09 |
| 21 | this.  I'm an economist, an expert in damages and | |
| 22 | pricing. | |
| 23 | Q.   Understanding that you disagree with what | |
| 24 | Mr. Gaskin has done, do you believe that it's | |
| 25 | possible, if done correctly, to marry a conjoint | 11:12:32 |

Page 70

1     I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4     That the foregoing proceedings were taken

5    before me, via videoconference, at the time and

6    place herein set forth; that any witnesses in the

7    foregoing proceedings, prior to testifying, were

8    duly sworn; that a record of the proceedings was

9    made by me using machine shorthand which was

10   thereafter transcribed under my direction; that the

11   foregoing transcript is a true record of the

12   testimony given.

13     Further, that if the foregoing pertains to the

14   original transcript of a deposition in a Federal

15   Case, before completion of the proceedings, review

16   of the transcript [ ] was [ ] was not requested.

17     I further certify I am neither financially

18   interested in the action nor a relative or employee

19   of any attorney or party to this action.

20     IN WITNESS WHEREOF, I have this date subscribed

21   my name.

22     Dated: August 10, 2020

23

24    CHRIS TE SELLE

25    CSR No. 10836

Page 83

**EXHIBIT 61**

R-O-U-G-H  D-R-A-F-T                    1

1    PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 273(b),

2    THIS ROUGH DRAFT TRANSCRIPT SHALL NOT BE CERTIFIED

3    AND CANNOT BE USED, CITED, OR TRANSCRIBED AS THE

4    OFFICIAL CERTIFIED TRANSCRIPT OF THE PROCEEDINGS.  A

5    ROUGH DRAFT TRANSCRIPT SHALL NOT BE CITED OR USED IN

6    ANY WAY OR AT ANY TIME TO REBUT OR CONTRADICT THE

7    OFFICIAL CERTIFIED TRANSCRIPT OF THE PROCEEDINGS AS

8    PROVIDED BY THE OFFICIAL REPORTER.

9

10

11

12

13

14                 WILL KAUPELIS, et al

15                        vs

16            HARBOR FREIGHT TOOLS USA, INC.,

17               8:19-CV-01203-jvs-dfm

18

19                       ---

20

21             DR. ROBERT ZEITHAMMER

22

09:13:22 23                 AUGUST 24, 2020

1    example.  Please give me a concrete example and we

2    can talk about it.

3         Q    Can we use the memory on the smartphone

4    example?

5         A    Okay.  Give me an example how that becomes a

6    -- what you mean by defect on that phone.

7         Q    Why don't we say that the smartphones memory

8    is defective such that you have issues saying photos

9    and videos to the phone.

10         Could a defect such as that one have an effect on

11   market price such that the price of the product would

12   be lower than it would have otherwise been but for

13   the defect?

14         MR. HERLING:  Objection as to form.

15         THE WITNESS:  I am not sure.  Because when I

16   looked at the Apple website, I did not see phones

17   marketed with that defect.

18         BY MR. LESLIE:

19         Q    So, you don't know whether a product that has

20   a defect, whether that defect could result in a lower

21   market price than the product otherwise would have

22   had?

23         A    I am not aware of an example of smartphones

24   with defective memory being marketed by Apple for

25    lower prices.

26        If they were, that would be a good example of

                        R-O-U-G-H  D-R-A-F-T                        10


1    what you are trying to find.

2        Q    Can you think of any defective products that

3    you've seen over the course of your work where the

4    market price of that product was lower than it

5    otherwise would have been but for the defect?

6        A    I am not sure.

7        Q    In your opinion, would you agree that

8    consumers are better off paying less money rather

9    than more money for a product?

10       MR. HERLING:  Objection as to form.

11       THE WITNESS:  If by product you mean the very

12   same product, they absolutely I would highly

13   recommend to all consumers to pay less money than

14   more money for the exact same thing.

15       BY MR. LESLIE:

16       Q    In your opinion, are there methods that can

17   be used to determine class-wide damages for a

18   consumer product sold at retail?

19       A    I am no lawyer.  I am not sure about class by

20   damages as an exact legal definition.  I am not a

21   lawyer.

22      Q    Have you ever heard the term before today?

23      A    Yes.

24      Q    Did you have trouble understanding it before

25   today or is there something about today that you

26   don't understand what "class-wide damages" means?

                    R-O-U-G-H  D-R-A-F-T                    11


1      A    I have a layman's understanding of the term,

2   but I am not a lawyer, so I don't know.

3      Q    I am asking you to apply your layman's

4   understanding to that term and answer the question.

5   I can repeat it if you would like.

6      A    Sure.  Repeat the question.

7      Q    Are there methods that can be used to

8   determine class-wide damages for a consumer product

9   sold at retail in your opinion?

10      A    So, by "class-wide damages" we mean some

11   compensation than I am just going tell you my

12   definition.  That some compensation that people who

13   have purchased the product, or something like that in

14   the past of service, that they should receive and

15   this is, of course, conditional on some definition of

16   the classes.

17      Again, as a non-lawyer, I don't quite grasp

18   completely.  But my understanding it's the class,

19    group of consumers who are similarly effected; is

20    that right?

21        Q    That is right, yes.

22        A    Okay.  So, yeah, I have certainly seen

23    examples of people trying to calculate these damages.

24        Q    Can you tell me some of those methods?  What

25    they are?

26        A    Well, I think think that the question is so

                        R-O-U-G-H  D-R-A-F-T                    12

1    broad that it could be used to focus on a specific

2    setting.

3        I have looked at some examples of the labeling

4    points in my work, so I am a little bit more familiar

5    that that's specific domain and there people often

6    use the conjoint analysis.

7                (Whereupon court reporter

8                 asked for clarification.)

9        THE WITNESS:  Sorry.  Again, about my terrible

10    accent.

11        And conjoint analysis is displayed labeling

12    claims because in a conjoint analysis, we can present

13    consumers with alternate labels.

14        BY MR. LESLIE:

15        Q    How about besides conjoint, can you think of

16   any others?

17        A    Not that I am an expert in.

18        Q    Are there methods that can be used to

19   determine class-wide damages for consumer product

20   sold at retail that has a defect?

21        A    I don't know.

22        Q    Did you conduct any research on this issue?

23        A    No.

24        Q    Do you know whether Defendant seeks to

25   maximum revenue?

26        A    No.  I don't know.

                    R-O-U-G-H  D-R-A-F-T                    13


1         Q    Do you know whether Defendant seeks to

2    maximum profit?

3         A    I don't know.

4         Q    Do you have any reason to believe that they

5    do not seek to maximum revenue or profit?

6         A    I do not.

7         Q    Do you know who sets the retail price for

8    Defendant's products?

9         A    No.

10        Q    Do you know the range of prices paid by

11   consumers that purchased class chainsaws?

12        A    Yes.  I have seen a spreadsheet which was

13    provided to me as part of data used by other experts,

14    right, in the case.  That spreadsheet, I was able to

15    see a range of prices.

16        Q    Do you recall what the range was -- sorry to

17    interrupt you.

18        A    Sorry.  Sorry.

19        No, I don't recall off the top of my head.  It is

20    in my -- but I did refer to it in my report, I

21    believe.

22        Q    Did you study the range of prices paid by

23    consumers for competing chainsaws?

24        A    Can you tell me what you mean by "competing

25    chainsaws"?

26        Q    Chainsaws that compete with Defendant's

                     R-O-U-G-H  D-R-A-F-T                    14


1     product in the marketplace?

2         A    Do you mean in Harbor Freight?

3         Q    I mean in the whole marketplace, not just

4     Harbor Freights store.

5         A    Then no, I did not conduct any comprehensive

6     analysis of comparative prices in the broad market

7     for chainsaws, in general.

8         Q    Can you name some of the competing brands for

9     the products at issue here?

10        A    Yes.  I believe that one of the central

11   brands is called Portland and it competes with

12   several brands at Harbor Freight.  And those brands,

13   I don't recall off the top of my head, but again I

14   list them in my report and they are easily visible of

15   course on Harbor Freight's website.

16        Q    Apart from chainsaws whose brands fall under

17   the umbrella of Harbor Freight Tools, can you name

18   any competing chainsaws?

19        A    Well, I can certainly name other chainsaws,

20   but I don't know the extent to which these are

21   competing chainsaws.

22        For example, in my garden shed, I have a chainsaw

23   by Black and Decker.  So, yeah, I have another

24   chainsaw that's -- I believe is not sold at Harbor

25   Freight, but I am not sure to the extent to which

26   this chainsaw is actually competing with the product

                    R-O-U-G-H  D-R-A-F-T                    15


1   at issue.

2        Q    For opining whether damages can be calculated

3   on a class-wide basis would you -- is it your opinion

4   that it's important to know the average price

5   consumers paid for the product at issue?

6        A    I think you would be more than the average

7    price.  I think that a detailed record of prices paid

8    by different consumers would be necessary to really

9    get at the question.

10        Q    Would understanding the fact that there's

11   multiple data points you would want to look at, is

12   one of those data points:  Average price paid?

13        A    Well, yes, sure.  After receiving a set of

14   prices, I could calculate for example, the average.

15   I could also calculate others.  But, again, just

16   knowing the average is not enough.

17        Q    Would you want to know the average price paid

18   by consumers for competing chainsaws as well?

19        A    Yes.  And, again, I would like to know not

20   just the average but a whole range of prices that

21   were paid for competing chainsaws.

22        Q    Are you familiar with the econometric

23   technique called hedonic regression?

24        A    I have heard of it in my -- in the course of

25   my graduate study.

26        Q    In your own words, are you able to just tell

                    R-O-U-G-H  D-R-A-F-T                    16


1    me what it is and how it works?

2         A    I would have to review the techniques.  I am

3    not an expert in.

4          Q      Then is it fair to say that you never

5    performed a hedonic regression analysis before?

6          A      Correct.

7          Q      We mentioned this phrase earlier and I

8    understand you're very familiar with it, but can you

9    tell me in your own words what a conjoint analysis is

10   and how does it work?

11         A      Sure.  Conjoint analysis is a survey

12   technique that allows analyst, such as myself, a

13   researcher such as myself, to measure consumer demand

14   for products that can be easily captured by specific

15   attributes, and the benefit of the technique is that

16   it mimics actual, so shopping environments to the

17   best analyst's ability, of course, and that way can

18   tap into the behavior that consumers exhibit when

19   they shop, which of course at the end of season of

20   demand.

21         Q      About how many times would you say you have

22   performed a conjoint analysis?

23         A      I think the word "perform" is difficult here

24   because that in some cases, I have conducted

25   analysis, myself, from beginning to end.

26         In other cases, I have worked with collaborators

                        R-O-U-G-H  D-R-A-F-T                    17

1    in which I didn't necessarily perform all of the

2    steps necessary.

3         Even more cases in my capacity as an instructor,

4    I have been involved with conjoint analysis conducted

5    by student groups for their projects.  But, of

6    course, I was trying to help them make sure that the

7    conjoint works out.  But, myself, did not perform as

8    to say that many, some, but not that many.

9         So there is a range of involvement that can point

10   to analysis.  So which of these levels of range of

11   involvement would you like me to tell you about.

12        Q    I am most interested in the first two

13   categories of involvement that you mentioned?

14        A    Probably dozens.

15        Q    And of those dozens of time, have they been

16   both inside and outside of the litigation context or

17   primarily for mitigation?

18        A    I would say primarily not for litigation.

19        Q    And if not for litigation, would it be for a

20   company of some sort?

21        A    Well, I am a researcher so -- conjoint

22   analysis as a very nice and useful research tool.

23   And, yes, I have conducted conjoint analysis for

24   companies in consulting roles as well.

25        Q    Did you conduct a conjoint analysis in this